(C. D. 1959)

The Baltimore & Ohio R. R. Co., a/c United China & Glass Company | *v.* United States
United China & Glass Co.

United States Customs Court, Third Division

(Decided January 21, 1958)

*Stein and Shostak* (*Philip Stein* and *Marjorie M. Shostak* of counsel) for the plaintiffs.
*George Cochran Doub*, Assistant Attorney General (*Richard M. Kozinn* and *Mollie Strum*, trial attorneys), for the defendant.
*Lamb & Lerch* (*John G. Lerch* and *David A. Golden* of counsel) as *amicus curiae*.

Before JOHNSON and DONLON, Judges

JOHNSON, Judge: The merchandise involved in these suits, consolidated at the trial, consists of so-called after-dinner coffee cups and saucers, imported from Japan in 1951 and assessed with duty under paragraph 212 of the Tariff Act of 1930 at 70 per centum ad valorem and 10 cents per dozen pieces as decorated china tableware. One shipment came in through the port of Baltimore and the other through the port of New Orleans. It is claimed that the merchandise is not tableware, but ornamental articles, properly dutiable at 50 cents per dozen, but not less than 45 per centum nor more than 70 per centum ad valorem, under said paragraph, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, and the President's proclamation of May 4, 1948, T. D. 51909. It was agreed at the trial that the merchandise was composed of china and porcelain or other vitrified ware, not containing 25 per centum or more of calcined bone.

The pertinent provisions of the tariff act are as follows:

PAR. 212. China, porcelain, and other vitrified wares, * * * composed of a vitrified nonabsorbent body which when broken shows a vitrified or vitreous, or semivitrified or semivitreous fracture, * * * painted, colored, tinted, stained, enameled, gilded, printed, or ornamented or decorated in any manner, and manufactures in chief value of such ware, not specially provided for, 70 per centum ad valorem. In addition to the foregoing there shall be paid a duty of 10 cents per dozen separate pieces on all tableware, kitchenware, and table and kitchen utensils.

Said paragraph, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, and the President's proclamation of May 4, 1948, T. D. 51909, reads:

| Tariff Act of 1930, paragraph | Description of Products | Rate of Duty |
|---|---|---|
| 212 | China, porcelain, and other vitrified wares (except sanitary ware, chemical porcelain ware, and chemical stoneware), composed of a vitrified nonabsorbent body which when broken shows a vitrified or vitreous, or semivitrified or semivitreous fracture, * * * : | |
| * | * * * * * <br> Articles of the kinds provided for in the preceding item which are painted, colored, tinted, stained, enameled, gilded, printed, or ornamented or decorated in any manner, and manufactures in chief value of such ware, not specially provided for: | * |
| * | * * * * * <br> Other (except tableware, kitchenware, and table and kitchen utensils): | * |
| * | * * * * * <br> Not containing 25 per centum or more of calcined bone_____ | * <br> 50¢ per doz., but not less than 45% nor more than 70% ad val. |

The record herein is voluminous, consisting of 606 pages of testimony taken at hearings in New Orleans, San Francisco, Los Angeles, and New York. Thirty-one witnesses were called and 24 exhibits received in evidence. Most of the witnesses were engaged in the business of buying and selling tableware and other chinaware, at wholesale or at retail, or in manufacturing the same, and were familiar with the instant merchandise or similar merchandise. The qualifications of the witnesses and their testimony will be particularized as necessary in the course of this opinion.

Samples representative of the imported merchandise were received in evidence as plaintiffs' collective illustrative exhibits 1 and 3 (hereinafter referred to as exhibits 1 and 3). They consist of china cups and saucers (after-dinner size) in various shapes and decorated in different patterns. Some of the cups are in the conventional shape of after-dinner coffee cups, some are like small teacups, some have footed bases, and some have scalloped or fluted rims. Some of the handles are of conventional shape and others are more elaborate. All the cups and saucers are decorated in various colors, with a considerable quantity of gold being used. The designs are ornate, some being floral and fruit patterns and some having more abstract motifs. Some of the cups are decorated on the inside as well as on the outside.

It is evident from an examination of this merchandise that the workmanship is not of very high quality. Some of the designs have not been applied evenly; in some places, the colors have run over, and, in others, they have either worn off or were not put on at all. The decorated surfaces are rough to the touch. According to the record, the cups and saucers are sold at retail at prices ranging from 35 cents to 98 cents per unit.

No coffeepots, sugar bowls, or creamers are included in the importations, and, according to the testimony, no such articles or any other pieces of chinaware are made to match the imported merchandise.

The merchandise is imported in cartons, containing 12 dozen cups and saucers in 18 different designs. The articles are packed in 18 boxes, each containing 8 cups and saucers of the same pattern. They are sold to retail stores in the cartons, as imported. Such merchandise is imported by others as well as by United China & Glass Co., but that firm is the largest importer and sells more of the items than anyone else in the United States.

Arthur A. Meyer, vice president of the importing company, explained the circumstances under which the merchandise was created and imported. He said that, about 6 or 7 years previously, a fad developed whereby individuals started to collect after-dinner coffee cups and saucers and display them for decorative purposes; that the volume of business picked up, and an assortment was worked out so that stores could purchase a carton and have a collector's group.

S. A. Stolaroff, president of the company, added that, prior to the war, his firm had been importing after-dinner coffee cups and saucers, plain shaped and in either one or two patterns, for use by the French people in New Orleans, who drink black coffee several times a day out of small cups. After the war, it appeared that such cups and saucers were also being sold in other sections of the country; an investigation was made, and it was found that consumers were buying them as collector's items. Consequently, the instant merchandise was designed to meet collectors' desires for different shapes and decorations. For the first time, purchasers were given an opportunity of buying little cups and saucers for as low as 50 cents or 59 cents and, for that reason, sales boomed. The witness said that the secret of the success was the creation each year of 6 new shapes and 18 new decorations, so that collectors never have to repeat.

Other trade witnesses stated that the wider the assortment of cups and saucers offered, the better the opportunity of selling them. For instance, the buyer for the Woolworth stores, located all over the United States, testified that his firm seeks to have a large assortment and to change patterns frequently, because that is the way the merchandise sells; otherwise, there would not be much business in that line. The Kress stores also look for new patterns, colors, and shapes,

because more are sold if the assortment is wide. Purchases are made from several sources, including United China & Glass Co., in order to get as large a variety as possible. The New York sales representative of the importer stated that shapes, designs, and decorations are changed approximately every 6 months, because customers never buy the same item twice but want to make a choice from a large selection.

This merchandise is offered by the importer to dealers as assorted groups of after-dinner coffee cups and saucers. It has been offered for sale at retail as "Charming additions to your knick-knack shelf, perfect translucent china gifts" (plaintiffs' exhibit 2) and is regularly advertised in trade publications as "Ideal for collectors" (plaintiffs' collective exhibit 5). It is offered by Montgomery Ward & Co. in groups of 6, assorted, as collectors' groups (plaintiffs' illustrative exhibit 6 and collective exhibit 8).

At Maison Blanche in New Orleans and at Loveman's in Birmingham, this merchandise is offered and sold as collectors' items. At Gump's in San Francisco, similar merchandise, although in a higher price range, is designated as collectors' pieces or engagement cups. At Charles Brown & Sons, in the same city, similar articles selling at 99 cents and up are purchased for collections to add a piece which the customer does not have. At Cliff House Gift Shop assorted Japanese cups and saucers like exhibits 1 and 3 are bought and sold as collectors' items.

In the experience of the buyer of the May Co. in Los Angeles, articles like exhibits 1 and 3 are invariably sold for decorative purposes and as collectors' items. He said that the customers prefer assorted patterns and designs just as collectors would like to have of any other particular commodity. At Barker Bros., customers buy one of a kind or a selection of several, if they are inexpensive enough, but they are bought assorted for decorative purposes. Similar merchandise has been sold to tourists at Farmers Market for 30 years, and, according to the merchant who testified, the customers indicate they are purchasing the items for their own collections or those of their friends.

According to a witness who had been employed at Gimbel's in New York and S. Kann's in Washington, customers purchasing merchandise like exhibits 1 and 3 said they were looking for a gift, an item that could be used in the house as a fancy knickknack.

The witnesses called by the plaintiffs who have handled this or similar merchandise testified that they had seen it used for decorative purposes and only occasionally for the service of coffee. They had observed it in homes throughout the country, particularly in New York, New England, Chicago, Cleveland, Minneapolis, San Francisco, Los Angeles, Baltimore, Washington, Atlanta, Miami, and New Orleans. They said that such articles are displayed on

knickknack shelves, mantles, tables, window ledges, and wall brackets. Sometimes they are placed on special display- stands like plaintiffs' illustrative exhibit 7. They are scattered around the living room or other rooms to give the home a little decoration or kept in cupboards or sideboards where there .is a collection of them. In the opinion of the witnesses, from their observation and experience, the chief use of such merchandise is for decorative purposes or as collectors' items.

Several collectors of such articles testified that they keep them on display and do not use them for serving coffee. Mrs. West stated she has collected cups and saucers like these all her life, but does not use them for the service of coffee. Mrs. Bullock also collects such items, displays them on shelves, and sometimes uses them to hold cigarettes or as ashtrays, but not for drinking coffee.

Miss Stafford testified that she collects china after-dinner coffee cups and saucers as a hobby and displays them on knickknack shelves in her living room and bedroom. When she serves after-dinner coffee, she uses cups and saucers which match her dinner set and does not use her collection, as she hopes the pieces will become.rare and valuable some day. Her collection differs from her other china, in that it includes articles which are gaudy and have a lot of filigree work, small feet, and fancy handles. When she purchases pieces for her collection, she looks for a pretty shape, a beautiful color, a lot of gingerbread, rarity, and unusualness. She does not purchase any two alike. She knows other people who collect such articles and said it was a common hobby.

Many of the witnesses called by the defendant testified that after-dinner coffee cups and saucers are designed and used for the service of coffee. They also said that they had seen merchandise like the imported articles used for the service. of after-dinner coffee in connection with a meal and that, in their opinion, that was their chief use. These witnesses included employees of manufacturers of dinnerware, retailers of merchandise, including dinnerware, for the most part of a higher quality and more expensive grade than that involved herein, and persons who had never seen the imported merchandise prior to the trial or had never handled it commercially.

The witnesses from manufacturing companies brought samples of after-dinner coffee cups and saucers produced by their firms (defendant's collective illustrative exhibits A, B, and D). Most such samples match dinnerware and are generally in conventional coffee-cup shape, although a few have fluted rims. They are decorated in subdued colors for the most part, and sell for $4.50 to $9 per cup and saucer.

The witnesses who produced these exhibits testified there was no difference in chief use between them and exhibits 1 and 3 and that such use was for the service of coffee in connection with a meal. They

said there was nothing about them that would prevent their use for the drinking of coffee.. However, one of the witnesses admitted that he had seen cups and saucers as ornate as these used as collectors' items, but did not know the quantity or percentage so used. Another witness said that in stating that exhibits 1 and 3 and defendant's exhibit D were suitable for use in drinking coffee, he was not referring to such articles as were used as collectors' items.

A witness who sold at retail produced a highly decorated, English bone china after-dinner coffee cup and saucer, selling for $8 per unit (defendant's illustrative exhibit C). He said that, in his opinion, it was an intelligent assumption that said articles and exhibits 1 and 3 were used for the service of after-dinner coffee. He had seen them so used, but was unable to state in what homes or in what quantities. He had never sold items exactly like exhibits 1 and 3 or in that price category and said that most of the after-dinner coffee cups and saucers in his store matched dinnerware sets.

Several witnesses testified that there was no difference in chief use between exhibits 1 and 3 and defendant's collective exhibit E, two Bavarian china cups and saucers, with smooth rims, and flower patterns in bright colors. In their opinion, the chief use of such articles was for the service of coffee. However, most of these witnesses did not handle commercially merchandise like exhibits 1 and 3 but carried better quality items. One witness' opinion was based on the view that there was nothing new made in Japan which was different from what had been made for almost a century in Europe. Another, a buyer for Plummer, Ltd., which handles high-quality merchandise, admitted that his store had a separate miscellaneous cup-and-saucer section where single cups are purchased as engagement cups. This witness had seen decorated cups and saucers displayed on stands on shelves in china closets and on wall brackets.

The witness Miller, who was in the business of selling dinnerware, testified that, in his opinion, from his experience in the trade and from personal observation, the use of merchandise like exhibits 1 and 3 was entirely and solely for the service of coffee. He admitted, however, that he had seen after-dinner coffee cups and saucers used as decorative items. He produced as examples of cups and saucers used for the service of coffee, very delicate Belleek china cups and saucers, selling at approximately $10 per unit (defendant's illustrative exhibits F and H).

In surrebuttal, this witness referred to a number of Japanese-made articles which he had bought at Woolworth's, namely, an after-dinner coffee set in a moss-rose pattern (defendant's collective exhibit J), purchased at the novelty counter, and other cups and saucers in the same rose pattern (defendant's exhibits K and L) and single after-dinner coffee cups and saucers (defendant's collective exhibit I),

purchased in the dinnerware section. In his opinion, all these articles are tableware. He said that the cups and saucers in defendant's collective exhibit J are similar in shape and decoration to those in exhibits 1 and 3 and their chief use is for the service of coffee.

Some witnesses had sold after-dinner coffee cups and saucers which did not match dinnerware or each other and had seen them used for the service of coffee in connection with a meal. They testified that there was a fad or practice of serving coffee in assorted after-dinner coffee cups and saucers, as conversation pieces.

Although some of the witnesses stated that articles like exhibits 1 and 3 are known in the trade as tableware, there was also evidence that the term "after-dinner cups and saucers" refers to the size of the cups rather than their use.

It was conceded that some of the imported cups could be used for drinking coffee, but, according to several witnesses, those with scalloped rims were not suitable for that purpose, because the coffee would dribble out or could only be taken in sips.

Another reason why the imported merchandise was considered by a number of witnesses unsuitable for use for the service of coffee was that the decorations were ornate and the cheap gold stamping would wear off in washing. While other witnesses stated that the decorations would last if the articles were well treated, their experience was with a more expensive type of merchandise. This was also true of the witnesses who said they had seen ornate patterns in dinnerware. For instance, the witness Starr had sold ornamental dinnerware sets for Georg Jensen's at prices ranging from $300 to $2,000, in which sets the after-dinner coffee cups and saucers were priced at $4 to $25 each. The witness Meyer pointed out that where after-dinner coffee cups and saucers in a dinner set are ornately decorated, the decoration is put on differently, and the items are sold for $75 to $100 a dozen. On the other hand, the witnesses from Woolworth and Kress, who dealt in inexpensive dinnerware, testified that they do not offer highly decorative patterns in such ware; that sturdier cups with a wide rim, and simple, not gaudy, patterns are chosen.

There was considerable evidence to the effect that small cups and saucers which do not match dinnerware sets or each other are purchased at retail in quantities of 1, 2, or 3, or in groups, such as the Montgomery Ward assortment of 6. However, where after-dinner coffee cups and saucers which match a dinnerware pattern are selected, they are usually purchased in quantities of 6, 8, or 12, in the same way as dinnerware. In open-stock dinnerware patterns, a customer may buy any quantity desired and may replace broken pieces as long as the manufacturer makes the pattern. The imported merchandise is not open stock, and, since the designs are constantly being changed, it would be difficult to make replacements.

In many stores, this merchandise or similar merchandise is not carried in the dinnerware department, but is offered in the gift, novelty, small wares, or stationery departments. Where it is carried in the dinnerware department, it is usually displayed on separate tables in assortments.

According to the record presented, after-dinner coffee cups and saucers are sold in minor quantities in the United States in comparison with the amount of dinnerware sold, but articles like those involved herein are sold in much greater volume than other after-dinner coffee cups and saucers. While sales of the instant merchandise have grown in recent years, sales of after-dinner coffee cups and saucers matching dinnerware have not increased and, in some cases, have declined.

The issue before the court is whether merchandise of the kind and class imported is classifiable as decorated china tableware under paragraph 212 of the Tariff Act of 1930 or as decorated chinaware, other than tableware, under said paragraph, as modified.

Plaintiffs claim that this merchandise differs materially from and is not of the class and character of after-dinner coffee cups and saucers used for the service of coffee, but is of the class of articles which is chiefly used for decorative purposes. The defendant and the *amicus curiae* contend that after-dinner coffee cups and saucers are tableware; that they may not be divided into two classes so as to remove some of them from classification as tableware; and that this merchandise belongs to the class of after-dinner coffee cups and saucers chiefly used for the service of coffee.

The leading case on the meaning of the term "tableware," as used in the tariff act, is *United States* v. *Butler Bros.*, 33 C. C. P. A. (Customs) 22, C. A. D. 310. The merchandise there was a decorated china dish in the shape of a saucer, having a wicker handle. The record indicated that such dishes were not used on the table in the service of meals, but were used after dinner on end tables and bridge tables to hold candy and nuts. There was also evidence that similar articles without handles were used for serving cereal, soup, or fruit. In holding that the imported merchandise was not tableware, the court said (p. 28):

We think it is evident from the dictionary definitions of the term "tableware" that in using that term in paragraph 212, *supra*, the Congress intended to provide for only such articles as are chiefly used upon a table for the service of meals, and that it was not intended to cover novelty articles, such as the involved bonbon and candy dishes, which are not chiefly used in the service of meals but, according to the testimony of record, are used on bridge tables and occasional tables for serving candy, nuts, etc., after a meal.

In *A. Jaller Co.* v. *United States*, 37 Cust. Ct. 439, Abstract 60413, the merchandise consisted of elaborately decorated plates with three holes punched through the base on the back. The sole witness

testified that he had never seen them used in the service of meals; that they were too decorative and gaudy to be eaten from; and that he had seen them hanging on walls as decorations. In view of the testimony and the exhibit itself, the court held that the merchandise was not ordinary tableware; that it was designed and adapted for use as a wall plaque and was so used. It was, therefore, not classifiable as tableware.

Similarly, it was held in a recent case, *United China & Glass Co. v. United States*, 39 Cust. Ct. 167, C. D. 1920, that decorated plates, having lattice borders, imported with pieces of ribbon inserted through the lattice work, were not tableware. The evidence showed that no other articles having the same patterns were carried; that such plates are purchased in small quantities and assorted patterns; and that they are used in a decorative manner and not in the service of a meal.

Other articles which have been held not to be tableware include mugs, used to contain a drink known as "Tom and Jerry," not usually served with meals, ginger jars and bowls, bonbon dishes, shaving mugs, toothpick holders, and miniature teapots, coffeepots, and pitchers. *M. Seller & Co. v. United States*, 66 Treas. Dec. 762, T. D. 47417; *Ignaz Strauss & Co., Inc. v. United States*, 15 Cust. Ct. 226, Abstract 50327; *The Baltimore and Ohio Railroad Company v. United States*, 33 Cust. Ct. 309, Abstract 58248; *P. Kuch Co. v. United States*, 65 Treas. Dec. 1376, Abstract 27378; *M. Pressner & Co. v. United States*, 2 Cust. Ct. 763, Abstract 41652; *Marks & Rosenfeld, Inc. v. United States*, 7 Cust. Ct. 233, Abstract 46139.

Articles held to be tableware include dishes used for serving tidbits and hors d'oeuvres; plates of the size and type used for the service of fruit, decorated with fruit patterns, having no hooks or rings adapting them for use as wall plaques, and dishes in the shape of carrots, radishes, and other vegetables. *Dritz Traum Co., Inc. v. United States*, 71 Treas. Dec. 676, T. D. 48935; *East-West Import Co. et al. v. United States*, 35 Cust. Ct. 31, C. D. 1716.

While cups and saucers are articles ordinarily regarded as tableware, the classification of a particular class of cups and saucers depends upon chief use, not the inherent nature of the article. *United States v. The Friedlaender Co.*, 21 C. C. P. A. (Customs) 103, T. D. 46445.

The record presented shows that there are after-dinner coffee cups and saucers which are used for the service of coffee, which cups and saucers are usually designed to match other dinnerware or each other and are in comparatively simple patterns, and that there are after-dinner coffee cups and saucers which are used for decorative purposes or as collectors' items, which cups and saucers are bought, sold, and collected in assorted shapes, colors, and patterns, and are often gaudy in design.

It is well established, of course, "that classification according to chief use depends upon use by users, as a whole, of the particular

type of commodity involved and not upon actual individual use of the particular shipment in question." *United States* v. *Spreckels Creameries, Inc.*, 17 C. C. P. A. (Customs) 400, 402, T. D. 43835. In the instant case, the testimony has been directed not only to the particular importations, but also to the same class of merchandise, which has been brought in by this importer and others for a number of years, and to similar merchandise. It would, of course, be impossible to locate all of the users of such or similar merchandise and to call upon them to testify; therefore, chief use must be established through those who have handled the merchandise commercially. Since importers and merchants naturally desire to increase the number of their customers and the demand for their goods, and have every incentive for knowing the uses of their merchandise, it may be assumed that they are familiar with such uses. *Klipstein* v. *United States*, 1 Ct. Cust. Appls. 122, T. D. 31120; *Kubie & Co.* v. *United States*, 12 Ct. Cust. Appls. 468, T. D. 40668; *Ignaz Strauss & Co., Inc.* v. *United States*, 28 Cust. Ct. 280, C. D. 1423.

It must be remembered that the merchandise involved in this case consists of small cups and saucers of various shapes and designs, ornately decorated, not matching dinnerware or each other, and imported in assortments. The witnesses who had dealt with this type of merchandise testified that it is chiefly used as decorative items; that the customers buy it for collections; and that they had seen it used throughout the country for display purposes. They pointed out that the volume of business depends upon variety of design and frequent change in pattern; that this merchandise is offered separately from dinnerware and is bought at retail in different quantities, usually 1, 2, or 3 cups and saucers, or in groups, assorted. It is sometimes sold with stands for display purposes. It is very highly decorated, but, according to several witnesses, the decorations would wear off, if the articles were washed frequently. It is sold in much greater volume than other after-dinner cups and saucers.

All of these factors support the testimony of these witnesses that merchandise such as that before us is chiefly used for decorative purposes or as collectors' items and not for the service of coffee.

In addition to the evidence given by trade witnesses, actual users of this merchandise stated that they collected such items, used them for decorative purposes and not for the service of coffee, and have seen them so used in homes in various parts of the country, including New York, Connecticut, Maryland, Richmond, Charleston, Chicago, and Los Angeles.

While defendant's witness Elizabeth McDonough stated that she owned articles like exhibits 1 and 3 and used them for the service of coffee, she also said she had three sizes of cups and did not use these small-sized ones, unless someone asked for a small cup of coffee. She

displayed her collection of assorted cups and saucers on a rack but stored those which matched dinnerware with other dishes.

Although many of defendant's witnesses testified that there was no difference in chief use between this merchandise and other after-dinner coffee cups and saucers, most of them were familiar with coffee cups and saucers which matched dinnerware and articles of a better quality and workmanship than those before us. While some of the witnesses knew of dinnerware as ornate as this merchandise, it is significant that the buyers for Woolworth and Kress, who handle inexpensive china articles, testified that their dinnerware is plainer, simpler, and sturdier than this merchandise. Cups of uniform size, with smooth rims, and handles that can be held easily are selected. The reason for this is that such items are made for utility purposes and for everyday handling. The customers prefer that they be sturdy so that there will be a minimum of breakage. It is evident that, in cheaper grade merchandise, the gaudier patterns and more fragile quality are in novelty articles and not in tableware.

In our view, the weight of the evidence clearly establishes that the imported merchandise does not belong to the class of articles which is chiefly used upon the table for the service of meals, but to the class of novelty articles which is chiefly used for display or decoration. We hold, therefore, that this merchandise is not properly classifiable as tableware, but is dutiable as decorated china, other than tableware, at 50 cents per dozen, but not less than 45 per centum nor more than 70 per centum ad valorem, under paragraph 212 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, and the President's proclamation of May.4, 1948, T. D. 51909.

The protests are sustained and judgment will be rendered in favor of the plaintiffs.