(C.D. 2617)

F. B. VANDEGRIFT & CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided February 15, 1966)

*Allerton deC. Tompkins* for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Harold L. Grossman*, trial attorney), for the defendant.

Before RAO, FORD, and NICHOLS, Judges; FORD, J., dissenting

NICHOLS, Judge: These two protests were consolidated at the trial. Protest No. 62/4282 covers curling irons, imported from Japan on February 26, 1961, and protest No. 62/12938 covers hair-straightening combs, imported from West Germany on November 21, 1961. Both were assessed with duty at 19 per centum ad valorem under paragraph 397 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108, as articles wholly or in chief value of metal, not specially provided for. It is claimed that they are dutiable at 17 per centum or 12½ per centum ad valorem under paragraph 339 of said tariff act, as modified, *supra*, as household utensils in chief value of base metal or brass, respectively. It was stipulated at the trial that the straightening combs were in chief value of brass, not enameled or plated with platinum, gold, or silver, or enameled with vitreous glasses, and that the curling irons were in chief value of steel, not plated with platinum, gold, or silver, or enameled or plated with vitreous glasses.

The pertinent provisions of the tariff act, as modified, are as follows:

[Par. 397.] Articles or wares not specially provided for, whether partly or wholly manufactured:

\*      \*      \*      \*      \*      \*      \*

Composed wholly or in chief value of iron, steel, copper, brass, nickel, pewter, zinc, aluminum, or other base metal (except lead), but not plated with platinum, gold, or silver, or colored with gold lacquer:

\*      \*      \*      \*      \*      \*      \*

Not wholly or in chief value of tin or tin plate:

\*     \*     \*     \*     \*     \*     \*

        Other, composed wholly or in chief
           value or iron, steel, brass, bronze,
           zinc, or aluminum (except \* \* \*)__ 19% ad val.

[Par. 339.]     Table, household, kitchen, and hospital utensils, and hollow or flat ware, not specially provided for, \* \* \*:

\*     \*     \*     \*     \*     \*     \*

    Not plated with platinum, gold, or silver, and not
       specially provided for, composed wholly or in
       chief value of—
           Brass_____ 12½% ad val.

\*     \*     \*     \*     \*     \*     \*

    Other base metal:

\*     \*     \*     \*     \*     \*     \*

           Other_____ 17% ad val.

At the trial, two samples of the hair-straightening combs were received in evidence as plaintiff's exhibits 1 and 2. The comb portions of these are of heavy metal with teeth and rounded backs. They have handles of some undisclosed material. Exhibit 1 is larger than exhibit 2. Three samples of the curling irons were received in evidence as plaintiff's exhibits 3, 4, and 5. These resemble the old-fashioned curling iron and are in three different sizes to make three different types of curl. According to the record, these items are used by Negro women to straighten their hair and then to curl it.

Five witnesses testified at the trial:

(1) Israel Gayer, partner of the Quaker Hair Goods Co., the importer herein, stated that the business of that firm is the importation and sale of human hair for wigs, and accessories, such as combs, brushes, and irons, and that he had been in the business since 1930, when he went to work for his father. He is now the chief executive and has charge of buying, selling, and advertising. He personally designed exhibits 1 through 5 for "a certain type of trade," and sold them throughout the United States in most towns containing a population of 25,000 or more except the Northwest. He specifically mentioned 19 states and the District of Columbia, and said he had seen the items used in all the states where there was a concentration of Negro population. He had traveled himself, called on dealers, and went with door to door salesmen to show them how to sell the merchandise. He had done this for 15 years up to about 10 or 12 years ago and had not done it since because he now knows the uses of the articles and, therefore, how to make them.

(2) Edward Howell III, partner and general manager of Howell Bros. Chemical Laboratory, manufacturers and distributors of cos-

metics, beauty accessories, hair products, and hair accessories, testified that he had been with that firm from its inception about 15 or 20 years ago, that his present duties include selling, demonstrating, and promoting at trade shows. The firm now and formerly has sold Quaker Hair Goods products. He formerly traveled all over the country selling items such as exhibits 1 through 5 personally but ceased to do so about 4 years before the trial. He had sold them in his father's drugstore when he was a boy and since then when he visited the store. He had sold them door to door in connection with his product, trying to use them as a premium or a promotion to sell other products. He had seen them used in just about every state where there is a sizeable Negro population. He had seen them used in his own home by his female relatives. He never saw them used except in the home. He now sells equipment to beauty parlors and knows they cannot use such merchandise.

(3) Ida Jones, sales girl in a Philadelphia drugstore and housewife, said that she sells Quaker Hair Goods products; that she had personally seen articles such as exhibits 1 through 5 used in Pennsylvania, Delaware, Maryland, North and South Carolina, Massachusetts, California, and British Columbia, where, during the past 7 or 8 years, she had visited relatives in homes and her sister in a WAC barracks. She uses them herself and had in fact used them the morning of the trial.

(4) Rosa Lee Dickerson, housewife, stated that she has personally used articles like exhibits 1 through 5 since she was 11 years old and had seen them used in other homes in South Carolina, Virginia, New York, and Pennsylvania.

(5) William Robinson, an independent door to door salesman, said that he has been a salesman since 1947 and has sold items like exhibits 1 through 5 for a number of years. He had seen them being used from Florida to New York.

According to these witnesses, items 1 through 5 have a wide and extensive use in the homes of Negro women and girls in the United States. Exhibits 1 and 2 are used to take the kinks out of kinky hair and to make the hair stand out straight. Exhibit 2, the smaller, is used for the temples, the short hairs in the back and along the nape of the neck. Exhibits 3, 4, and 5 are then used to curl the hair.

These articles are used in the kitchen since they must be heated and that is usually done over an open flame of the gas stove. They are kept with other larger kitchen utensils and are used by all the female members of the family at intervals of from 3 to 14 days. They are used for the personal convenience and comfort of the women, to improve their appearance, give a "western" look, and keep up their status, and

are essential articles of utility for Negro women. Use of these articles in the home is more economical than going to beauty parlors.

These articles are sold by door to door salesmen and through drugstores and mail-order houses. They are not sold to beauty parlors and beauty supply houses. They are designed for the household trade and are not sold and are not suitable for professional use. Straightening combs and curling irons used by professionals are constructed differently, will not break the hair as easily, will heat faster, and will hold the heat longer.

Before we reach the issues the parties have briefed, we dispose of one they have not. Neither party makes any claim under paragraph 1537(c), as modified, "Combs of whatever material composed, except combs wholly of metal * * *, not specially provided for." Exhibits 1 and 2 are, respectively, called "combs" in the testimony and are so invoiced. They appear to be probably not wholly of metal, the handles looking and feeling nonmetallic. If the construction of paragraph 1537(c) were free from doubt, we would deem ourselves obliged to hold it applicable to exhibits 1 and 2, although in that event we could only overrule the protests without affirming the collector's classification. The dictionary definition of "comb" is as follows:

1. An instrument consisting of a thin strip, as of metal, bone, wood, etc., with a row of teeth on one or both edges or sides, used for adjusting, cleaning, or confining the hair, or for adornment. [Webster's New International Dictionary.]

There are some respects in which this definition does not fit the merchandise at bar, notably as to use. The possibility that exhibits 1 and 2 are not combs in the tariff sense is one we cannot eliminate entirely, without testimony and without briefing. We do not know judicially that the articles are not wholly of metal. The presumption of correctness of the collector's classification compels us to suppose he omitted to classify them as combs for some valid reason, unknown to us. This decision is not to be taken as passing in any way on the applicability of paragraph 1537(c) to the merchandise.

Plaintiff claims that these articles are household utensils within the meaning of that term as used in paragraph 339, *supra*, in that they are utensils chiefly used in the household for the personal comfort and convenience of the members thereof. Defendant contends that the evidence is insufficient to overcome the presumption of correctness attaching to the collector's classification, on the ground that the proof does not establish chief use of merchandise of this class at or immediately before the date of importaton.

In *I. W. Rice & Co.* v. *United States*, 24 CCPA 114, T.D. 48415, it was held that atomizers used to spray the body with powder after the

bath were classifiable as household utensils under paragraph 339. The court stated (p. 116):

It is clear from the authorities hereinbefore referred to that the term "household" means family. Accordingly, the term "household utensils" must mean utensils used by the members of the household, either for their personal convenience and comfort, or for the care and maintenance of the household. We are of opinion, therefore, that the term "household utensils," as used in paragraph 339, *supra*, was intended to include not only utensils which are used in the maintenance and care of the home, but also those, not more specifically provided for, which are chiefly used in the household by the members thereof collectively for their convenience and comfort.

Had the Congress intended to limit the provisions in question to such articles as were designed to be and were chiefly used in the care and maintenance of the household, it would have been an easy matter for it to have made such intention clear.

*       *       *       *       *       *       *

We adhere to the views expressed in the case of *Frank P. Dow Co., Inc.* v. *United States, supra* [21 CCPA 282, T.D. 46816], wherein we said that if the articles are utensils within the meaning of that term as defined in the *Ellis Silver Co.* case, *supra* [16 Ct. Cust. Appls. 570, T.D. 43297], and if they are chiefly used in the household, they are household utensils, and dutiable as such, unless otherwise more specifically provided for.

In reliance upon this case and in view of stipulations by the parties, it has been held that curling irons are household utensils. *New York Merchandise Co., Inc.* v. *United States*, 73 Treas. Dec. 1298, Abstract 38680; *Strauss Bros. & Co.* v. *United States*, 5 Cust. Ct. 329, Abstract 44392.

The views expressed in the *Rice* case, *supra*, have been quoted and followed on many occasions. See, for example, *Davies, Turner & Co.* v. *United States*, 47 CCPA 129, C.A.D. 744; *United States* v. *Lipman's* 52 CCPA 59, C.A.D. 859.

The chief use to be established must be that of the class of articles to which the particular importation belongs at or immediately before (but not after) the date of importation. *Bangor & Aroostook Railroad Co. et al.* v. *United States*, 20 CCPA 96, T.D. 45724; *H. J. Baker & Bro.* v. *United States*, 37 CCPA 52, C.A.D. 419; *United States* v. *The Baltimore & Ohio R.R. Co. a/c United China & Glass Company*, 47 CCPA 1, C.A.D. 719; *United States* v. *Bruce Duncan Co., Inc., a/c Kasuga Sales, Ltd., National Silver Company*, 50 CCPA 43, C.A.D. 817; *United States* v. *C. S. Emery & Company*, 53 CCPA —, C.A.D. 868, January 13, 1966, Appeal 5187.

If it should be necessary to the correctness of our decision, as the dissent herein urges, to find that the articles involved and articles

of the same class or kind were not known to the trade or commerce of the United States in 1930, we do so find. The record establishes that the witness Gayer has been in business only since 1930 and he personally had the involved hair curlers and combs first made to his specifications at some undisclosed later date. There was much testimony about the old-fashioned curling iron, used by the mothers and grandmothers of many of us, but in view of the record, we find that this was not an article of the same class or kind as the curling iron in litigation. It had important differences in design and in manner of use. Similarly, the evidence showed that the article most like the comb in litigation was one of more elaborate design, used by professional beauticians in beauty shops. We do not consider that of the same class or kind as the one in litigation, and so whether it was known in 1930 was immaterial. There were small cups and saucers imported in 1930, but not of the same class or kind as those classified as not tableware in *United States* v. *The Baltimore & Ohio R.R. Co. a/c United China & Glass Company, supra*, by reason of the new chief use that had grown up. Compare also the separation of classes for determining chief use in *United States* v. *C. S. Emery & Company, supra*.

However, we also hold that any evidence of chief use in 1930 is not required, whether or not articles of the class or kind of the instant imports were then known to commerce. The court said in *United States* v. *The Baltimore & Ohio R.R. Co. a/c United China & Glass Company, supra*, at page 4:

We believe that where, as here, classification is to be determined on the basis of chief use, that determination should be made at the time of importation, whether or not the tariff provision in question explicitly requires classification by chief use.

If this be *dictum*, the asserted fact is irrelevant for our purposes in view of our holding in *Roberto Colon Machinery Co.* v. *United States*, 46 Cust. Ct. 138, C.D. 2247, appeal dismissed, *United States* v. *Roberto Colon Machinery Co.*, 48 CCPA 169, where the involved merchandise, the K–55 tractor, had been known in 1930 but had become chiefly used in agriculture only at a later date.

Whether or not our appellate court has correctly followed the precedents applicable at the times of its decisions, and whether its remarks were necessary, are matters it could determine and presumably did. *Cf. Kroder Reubel Co., Inc., et al.* v. *United States*, 44 Cust. Ct. 274, C.D. 2186, at pages 278–279. It does not seem any comment by us is indicated except possibly agreement such as Judge Lawrence expressed in *Roberto Colon Machinery Co.* v. *United States, supra*, at page 143. We would regret any lapse of adherence to the new rule, if

it is new. It will be effective anyway in chief use classifications under the new schedules in view of headnote 10(e)(i), Tariff Schedules of the United States. The Government apparently acquiesces in it, judging by its litigation position in the instant case, where all its fire was directed at plaintiff's alleged failure to show chief use at or just before the time of importation. We must assume and do assume that the position of Government counsel before us reflects the Treasury's considered view. It would be regrettable for the courts to announce a rule, new or not, see the Treasury's acquiescence and its adoption in the new schedules, and then repudiate it. From the point of view of administrative feasibility, there is not much to be said for classification by chief use, either as of the date of enactment or as of the date of importation. Each offers its own set of horrors, different from the other, and each could be counted on to keep the lawyers busy. The Congress prescribed classifications requiring use determination in the 1930 act for policy reasons which it then deemed paramount over the convenience of courts or customs officers. An effort is made in the TSUS to diminish the instances of resort to chief use classification. The time of enactment rule offers much the greater risk of frustrating the policy of the Congress, a risk that becomes more noticeable as the gap widens between the date of enactment and the date of importation. For example, paragraph 1604 put agricultural implements on the free list to benefit agriculture, but this policy would become diluted and frustrated if articles no longer chiefly used by farmers still got free entry while articles which came to be chiefly used by farmers were denied free entry. We say more than we otherwise would have about this problem in view of the dissenting opinion which will be filed herewith.

Chief use is, of course, an issue of fact which, it has been held, must be "established on the basis of positive testimony representative of an adequate geographical cross section of the nation." *L. Tobert Co., Inc., et al.* v. *United States*, 41 CCPA 161, 164, C.A.D. 544; Acc. *United States* v. *Gardel Industries*, 33 CCPA 118, C.A.D. 325. Nevertheless, it is proper to consider not only the testimony but the characteristics of the merchandise itself. *United States* v. *Colibri Lighters (U.S.A.) Inc.*, 47 CCPA 106, C.A.D. 739. If it may be deduced from the evidence and from the samples that the merchandise would be used in substantially the same manner, and by substantially the same sort of people, in one section of the country, as in another, evidence establishing chief use in a "large area" of the country is sufficient. *United States* v. *F. W. Woolworth Co.*, 23 CCPA 98, T.D. 47765.

Determining chief use is also a matter for common sense. Here we have articles before us which, we are told, are used in the home by Negro women to straighten and afterwards curl their hair. We had the benefit of testimony by the man who designed these articles, who imports them, and who has promoted their sale all over the United States. There is no scintilla of evidence, either in the appearance of the articles themselves, or in the testimony, of any other possible use, except in beauty parlors. But the witnesses negative that, establishing that they are unsalable to beauty parlors, because of inferiorities in construction and operation. Beauticians require articles that hold the heat better and are less likely to break the hair. Gayer and Howell know the requirements of beauty parlors because they sell other articles to them. Witnesses have sold the merchandise here involved widely over the United States. All five who testified have seen them often in use in homes, and the two female witnesses have used them themselves.

While the cases talk about "large areas," it is clear they do not mean thinly populated areas large in square miles such as Arizona or New Mexico. With an article used by Negroes, naturally the geographical coverage of interest to the court is over states and cities where Negroes live. Here, the testimony deals with most of the Northeast, the Middle West, the Southeast, the Gulf States, and the West Coast. In the circumstances, less would have been sufficient.

The Government's chief and virtually sole argument, as we construe its brief, is that chief use has not been properly pinpointed as to a time at or immediately before the time of importation. It quotes *United States* v. *The Baltimore & Ohio R.R. Co. a/c United China & Glass Company, supra,* which, however, involved determining the tariff consequences of a temporary fad for use of small cups and saucers other than as tableware. The case would be more in point if the Government could suggest some other possible use of the merchandise we have to consider, which might have been the chief use in the past or could become so in the future. It is indeed a refined argument for a commercial court, to urge that what is shown without contradiction to be the sole use is not thereby proved to be the chief use also. Since the evidence establishes that from the time the merchandise was first designed to the time of trial, no other use was known than in the home, as testified, an adequate basis is given for us to find, and we do find, that such was its chief use on or just before the dates of importation.

The Government makes much of the fact that the witnesses Gayer and Howell ceased to go into people's homes to sell this merchandise years before the dates of importation. This entirely misunderstands

the probative weight of the testimony executives can give, who have been concerned in designing, framing specifications, ordering, importing, selling, distributing, and promoting the manufactured article whose chief use is to be determined. Gayer and Howell continued to deal in the involved straighteners and curlers. Such persons have to know the chief uses of what they sell and sporadic instances of their seeing it in use in people's homes (on social occasions perhaps) add but little. One gets rather tired of having such instances dragged in by the ears. The case the Government chiefly relies on, *United States* v. *The Baltimore & Ohio R.R. Co. a/c United China & Glass Company*, *supra*, offers at pages 4 and 5 an excellent example of proof effected by means of executive's testimony. The more extended opinion of the trial court in the same case, *The Baltimore & Ohio R.R. Co., a/c United China & Glass Company et al.* v. *United States*, 40 Cust. Ct. 58, C.D. 1959, also deserves careful study.

In our view, relatively the weakest part of the plaintiff's otherwise strong and convincing case, is its showing that the merchandise here involved is used "collectively." However, the witnesses stated without contradiction that typically only one set of straightening and curling appliances is maintained in one home; it is kept in the kitchen and used by all the female members of the family. We are not certain what our appellate court in *I. W. Rice & Co., supra*, meant by the word "collectively," but doubtless it would exclude articles such as toothbrushes which owners customarily reserve to their own use, supposing any of such articles might otherwise come under paragraph 339. While each member of a family normally has his or her own comb for combing hair, a family would not ordinarily have more than one set of straightening combs and curling irons, since they are not used even as much as once a day by any one person and are more expensive than regular combs. The testimony showed that prosperous persons would not buy the merchandise involved but would go to beauty parlors. Hence, the users are those who are less well to do and who would regard more than one set in the household as an extravagance. We hold that the testimony herein meets the test of collective use.

On the record presented, we hold that the straightening combs, conceded to be in chief value of brass, are properly dutiable at 12½ per centum ad valorem under paragraph 339 of the Tariff Act of 1930, as modified, *supra*, and that the curling irons, concededly in chief value of steel, are dutiable at 17 per centum ad valorem under said paragraph, as modified. The protests are sustained, and judgment will be rendered for the plaintiff.

DISSENTING OPINION

FORD, Judge: The majority opinion in holding the imported curling irons and hair-straightening combs to fall within the purview of paragraph 339 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, of necessity found said articles to be chiefly used in the household, which is a prerequisite for classification of merchandise under said paragraph 339, *supra.* However, in finding such chief use, the majority based its decision upon the chief use on or about the date of importation and cited in support of this principle the following cases: *Bangor & Aroostook Railroad Co. et al.* v. *United States,* 20 CCPA 96, T.D. 45724; *H. J. Baker & Bro.* v. *United States,* 37 CCPA 52, C.A.D. 419; *United States* v. *The Baltimore & Ohio R.R. Co. a/c United China & Glass Company,* 47 CCPA 1, C.A.D. 719; *United States* v. *Bruce Duncan Co., Inc., a/c Kasuga Sales, Ltd., National Silver Company,* 50 CCPA 43, C.A.D. 817.

It may well be that the more realistic and logical approach to determining the time which governs in the question of chief use, should be on or about the date of importation. This is particularly so in view of the lapse of time since the enactment of the Tariff Act of 1930, which now creates an almost impossible task for the party attempting to establish chief use, since he must be in position to elicit testimony from witnesses who had dealt in the involved article on or prior to June 17, 1930. However, the law with respect to chief use has been established by the Court of Customs and Patent Appeals and this court over the years and has not in my opinion been repudiated in any of the cases cited by the majority, *supra.* The basic principle of law relative to this matter is that the use at the time the statute was enacted governs. *Edward Curtis* v. *William Martin and Charles A. Coe,* 44 U.S. 106; *Auffmordt & Co. et al.* v. *United States,* 7 Ct. Cust. Appls. 56, T.D. 36320; *United States* v. *F. W. Myers & Co., Inc.,* 24 CCPA 464, T.D. 48913; *Alfred Bloch & Co., Inc.* v. *United States,* 73 Treas. Dec. 285, T.D. 49407; *United States* v. *Belgam Corp. et al.,* 22 CCPA 402, T.D. 47402; *United States* v. *C. J. Tower & Sons,* 26 CCPA 1, T.D. 49534; *United States* v. *Dyson Shipping Co.,* 27 CCPA 260, C.A.D. 96; *United States* v. *C. S. Emery & Company,* 53 CCPA —, C.A.D. 868, decided January 13, 1966.

One exception to the time governing chief use is as indicated where the statutory provision contains specific language, such as, "used chiefly for fertilizer" or "used for tanning," as contained in the paragraph involved in the *Emery* case, *supra.* In such event, the law has required proof of chief use on or about the date of importation.

*United States* v. *Belgam Corp. et al., supra; H. J. Baker & Bro.* v. *United States, supra.*

Another exception to the principle of chief use on or about the date of the enactment of the tariff act, is where a use provision, not containing special language, is applied to an article which was first introduced into the commerce of the United States, after the enactment of the tariff act. In such a situation, the chief use of such an article on or about the date of importation is controlling. *United States* v. *Geo. Wm. Rueff, Inc.*, 41 CCPA 95, C.A.D. 535. This exception to the general use is understandable since it is axiomatic that Congress legislates for the future as well as for the present and it must be assumed that Congress in indicating a particular provision intended to encompass all such merchandise whether in existence or created, devised, or discovered thereafter.

A review of the cases cited by the majority for the principle that chief use on or about the date of importation is controlling in the instant case, reveals that the *Bangor* case, *supra*, and the *H. J. Baker* case, *supra*, both involved paragraphs containing specific provisions, to wit, "used chiefly for fertilizer," and are, therefore, distinguishable. In the *Baltimore & Ohio* case, *supra*, and the *Bruce Duncan* case, *supra*, the records as digested in said cases established them to be new articles of commerce which were not in existence on or about the date of the Tariff Act of 1930. Accordingly, these cases are not controlling herein. I am, therefore, in agreement with the decisions in the *Baltimore & Ohio*, case, *supra*, and the *Bruce Duncan* case, *supra*, since the merchandise involved in those cases consisted of new articles of commerce. It is particularly interesting to note that in the *Bruce Duncan* case, *supra*, decided more than 3 years after the *Baltimore & Ohio* case, *supra*, the appellate court cites the case of *Wilbur-Ellis Co. et al* v. *United States*, 18 CCPA 472, T.D. 44762, for the principle that "chief use is to be determined as of the date of importation of the merchandise in issue." The *Wilbur-Ellis* case, *supra*, likewise involved a statutory provision containing special language, to wit, "used chiefly for fertilizer." Therefore, in my opinion none of the cases cited by the majority nor the *Wilbur-Ellis case, supra*, is controlling.

In the case at bar, an examination, particularly of the curling iron, indicates to me that it is an article substantially similar to the old-fashioned curling iron that I had observed my mother and grandmother using during my childhood. While it is true that the record establishes that the imported curling iron does not contain a spring and, therefore, requires more skill in its operation, it nevertheless belongs to the same class or kind of article as the old-fashioned curling iron which was in existence on and prior to June 17, 1930. Ac-

cordingly, with respect to said curling irons, the burden imposed upon plaintiff herein, under the law as set forth, *supra*, required the establishment of chief use on or about the date of enactment of the tariff act, June 17, 1930. This is so since the involved curling irons are not new articles of commerce and the provisions of paragraph 339, *supra*, do not contain special language which would indicate a time other than the enactment of the tariff provision involved herein. The record, therefore, in my opinion fails to establish such use.

The record as made herein does not clearly establish whether the hair-straightening combs were or were not in existence on or about June 17, 1930, and the record does not in my opinion satisfactorily establish such use on or about the date of the enactment of the tariff act. On the other hand, if said combs are a new article of commerce invented subsequent to the date of enactment of the tariff act, it was the burden of plaintiff herein to establish that said articles were not in existence on and prior to June 17, 1930. Having failed to do so and the record failing to establish chief use on or about June 17, 1930, plaintiff has failed in both instances to overcome the presumption of correctness attaching to the classification of the collector.

I would, therefore, overrule the protests.