(C.D. 2832)

FRED BRONNER CORP. *v*. UNITED STATES

United States Customs Court, First Division

(Decided November 28, 1966)

*Siegel, Mandell & Davidson* (*David Serko* and *Murray Sklaroff* of counsel) for the plaintiff.

*Barefoot Sanders*, Assistant Attorney General (*Glenn E. Harris*, trial attorney), for the defendant.

Before OLIVER, NICHOLS, and WATSON, Judges; NICHOLS, J., concurring

OLIVER, Judge: The parties in this case agreed to consolidate four protests for the purposes of trial, and the plaintiff herein narrowed its claim in these protests to the items described on the entry papers as "Models of Yesteryear" or the "Yesteryear Series," abandoning any claims with respect to other items appearing on the entries involved. The merchandise was assessed with duty at the rate of 35 per centum ad valorem under paragraph 1513 of the Tariff Act of 1930, as modified by T.D. 52739, as toys, not specially provided for. The claim presented to the court is for classification as manufactures of metal within the provisions of paragraph 397 of said act, as modified by T.D. 54108, and dutiable thereunder at the rate of 19 per centum ad valorem.[1]

The relevant language of the involved tariff provisions reads as follows:

Paragraph 1513, as modified by T.D. 52739:

Toys, not specially provided for:

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

Other _____ 35% ad val.

---

[1] Defendant's motion to dismiss protest 62/14785 for lack of jurisdiction over the subject matter was denied at trial and is not renewed in its brief.

Paragraph 1513, as originally enacted, contains the following proviso:

* * * As used in this paragraph the term "toy" means an article chiefly used for the amusement of children, whether or not also suitable for physical exercise or for mental development. * * *

Paragraph 397, as modified by T.D. 54108:

Articles or wares not specially provided for, whether partly or wholly manufactured:

*        *        *        *        *        *        *

Composed wholly or in chief value of iron, steel, copper, brass, nickel, pewter, zinc, aluminum, or other base metal (except lead), but not plated with platinum, gold, or silver, or colored with gold lacquer:

*        *        *        *        *        *        *

Not wholly or in chief value of tin or tin plate:

*        *        *        *        *        *        *

Other _____ 19% ad val.

Plaintiff's evidence at trial consisted of the testimony of four witnesses as well as the introduction of a number of exhibits. The defendant offered no evidence in this case.

Exhibits 1 through 5 and 7 through 16 represent the imported items in issue. They consist of miniature vehicles representing antique and classic cars, buses, trucks, engines, and the like, and range in size from around 2½ to 3½ inches long and about 1 to 2 inches high. Exhibits 1–A through 5–A and 7–A through 16–A are the boxes in which the vehicles are imported and sold. Each box, which is labeled "Models of Yesteryear," contains the name, description, and historical significance of the scale model inside.[2] The following tabulation indicates the kind and variety of the items involved herein:

--------

[2] For example, "1929 4½ litre (S) BENTLEY," exhibit 1–A, contains the following legend: "The supercharged version of the famous 4½ litre BENTLEY first appeared in 1929, when Sir Henry Birkin developed three cars—sponsored by the late Miss Dorothy Paget—in his Welwyn workshops. This car is the first 'Birkin Blower'. These cars were raced in 1930, when a fourth car was built, and 1931, and were known as the 'Birkin Blower Team'.

"Bentley Motors Ltd. built only fifty supercharged cars all told—in 1930 and 1931. These had a maximum speed, in Touring Trim, in excess of 100 m.p.h. and consumed petrol at the rate of 12–15 m.p.g.

"Today, this original Birkin Blower Bentley can be seen in the Montagu Motor Museum at Beaulieu, Hants, where it is on loan, when not being used in various motoring events by its present owner, Harry Rose of Poole, who is responsible for restoring it to its present condition.

"It still has a maximum speed well in excess of 120 m.p.h. with acceleration to match. Scale 52–1"

| Exhibit No. | Name of exhibit |
|---|---|
| 1–A | New Model 1929 4½ Litre "Blower" Bentley |
| 2–A | Scale Model A.E.C.Y. Type Lorry |
| 3–A | Scale Model 4-Ton Leyland |
| 4–A | Scale Model The Bullnose Morris Cowley of 1926 |
| 5–A | Scale Model 1908 Mercedes |
| 7–A | 1904 Spyker |
| 8–A | Scale Model The Allchin 7–N.H.P. Traction Engine |
| 9–A | B Type London Bus |
| 10–A | Scale Model "E" Class Tramcar |
| 11–A | Scale Model Sentinel Steam Waggon |
| 12–A | Fowler "Big Lion" Showman's Engine |
| 13–A | Aveling & Porter Steam Roller |
| 14–A | Horse Bus |
| 15–A | Scale Model American 4–4–0 |
| 16–A | Scale Model Duke of Connaught |

Counsel have stipulated that the merchandise contains the requisite metal composition prescribed in the claimed provisions of paragraph 397. Pursuant to the court's permission the parties submitted the following written stipulation of fact:

1. The quantity of "Models of Yesteryear" sold by Fred Bronner Corp., throughout the United States, during the period May 1, 1959 through October 31, 1960, was 74,475 dozens.

2. The quantity of "Matchbox" Series sold during the same period by Fred Bronner Corp., throughout the United States, was 405,650 dozens.

Plaintiff's initial witness was Mr. Irving Yasny, sales manager of the Fred Bronner Corp. Mr. Yasny testified that he has been with the plaintiff corporation since 1956—first as a salesman and then, as the company grew and his duties expanded, he performed the function of sales manager although he did not receive the official title until 1961. He explained that the business of the Fred Bronner Corp. was the importing and distributing of toys and hobby items mainly from England and that they were the exclusive importers and distributors of the protested merchandise.

The "Models of Yesteryear" are sold by Bronner to wholesalers throughout the United States who Yasny claimed represented every major hobby wholesaler and 98 percent of the smaller ones. Yasny visits some of the firm's wholesale customers from time to time and he has also made it his practice to occasionally drop in on retail buyers to see that they are receiving the merchandise and are being properly serviced by the wholesaler. It was his testimony that he had never seen these items used by children but that he had seen them displayed

at Sardi's Restaurant in New York City and in the homes of friends. On the latter occasions he had observed the models placed in bookcases or on knickknack shelves as part of decorative collections.

On cross-examination, the witness stated that his company deals with around 500 wholesale distributors on a regular basis; that he has not visited all of them; and that he was unable to say how many retailers receive their merchandise but that he has visited about 25 to 50 retail outlets in the past 2 years. He admitted that his observations of the models in the homes of his friends occurred at nighttime when the children of the house may have been in bed. However, he did reassert that they were collected and displayed by the owners who were themselves model collectors. He further testified that he was aware of many nationwide and even international clubs of collectors concerned with these items.

Mr. Herbert Lozier testified as plaintiff's second witness. He identified himself as a model consultant, magazine author, research man, and collector of antique automobiles. He has authored around 75 articles for various leading model magazines, including Popular Science and Mechanics Illustrated, on subjects covering the construction of model automobiles, boats, locomotives, airplanes, and the like. He has worked on model construction for the Museum of Science and Industry in the RCA Building, at both New York World Fairs, and for the United States Army during World War II. Mr. Lozier further stated that he is a member of several national and international antique automobile clubs [3] and that, in this connection, he has lectured on, and been a judge of, various model making activities. Plaintiff's third witness, Mr. Herbert Jaffe, an antique car hobbyist himself for over 20 years, recognized Mr. Lozier as a leading authority in this country on antique and classic cars.

Thus qualified as a model expert, Mr. Lozier testified that he was personally familiar with the "Models of Yesteryear" series and that he has been a collector of them since their inception. It was his opinion that they are very authentic models of the vehicles they represent and, further, that they are well known to collectors and model makers. Specifically with reference to plaintiff's exhibit 1, a 4½ litre Bentley of the late twenties vintage, he testified:

A. Its entire attitude is proper: its proportion is proper; all of its detail, as far as I can see on here, is practically 90 per cent complete. The only thing that I see it lacks is a series and springs; otherwise I would say it was an almost exact scale model.

Q. Would you say that the detail is important in the reproduction?—A. Extremely.

---

[3] The Antique Automobile Club; The Veteran Motor Car Club; The Horseless Carriage Club; The Classic Car Club; The International Association of Automotive Modelers; and Le Amis de Delage of France.

Q. And would you say that this satisfies this requirement?—A. More than satisfies it.

On the question of use, Mr. Lozier stated that he had seen the imports displayed in restaurants, "mounted on the dashboards of the antique automobiles" at antique car exhibitions, at the International Auto Show in New York City, and in the homes of several friends and fellow members of the various auto clubs to which he belongs. He had never seen them used by children. In homes, they were displayed mostly in cases where one or more of the whole series was kept. The auto clubs have an average membership of from 3,500 to 5,500 people and their function is "to preserve the historical feeling of the automobile as part of the American heritage." However, the collecting interest of the members is not limited to old-fashioned automobiles but extends to anything pertaining to automobilia including oldtime trucks, buses, threshers, locomotives, steam rollers, and head lamps.

On cross-examination, the witness explained that many auto club members rebuild and refinish antique cars and also build their own scale models, with the detailing confined mostly to the exterior workings as it is on the merchandise at bar. He further testified that he was not connected with the importer herein and, therefore, did not know what proportion of the total imports of this merchandise was used in the clubs. He did say, however, that, from his personal observation, the majority of people he has met in the auto clubs collect these or similar models of the same category made by other firms.

As previously mentioned, the third witness to testify for the plaintiff was Mr. Herbert Jaffe. Aside from being an antique automobile hobbyist, Mr. Jaffe identified himself as a mechanical engineer employed as new products designer for M & E Industries, a toy manufacturing firm. Before that, he had been employed by the New Order Multiple and the Ideal Toy companies, both of which are engaged in toy manufacturing. He stated that, in all three instances, he was in charge of creating new products which involved the engineering and development of toys from model design through production. Previous to his employment in the toy industry, Jaffe had worked as an automobile stylist and designer with General Motors Corp. becoming a senior automobile designer before leaving.

Mr. Jaffe testified that, in his position as a designer for these various toy companies, it was important to his work to be familiar with the toy markets and what will sell in them. He stated that he was personally familiar with the imported items and that he had seen them collected on shelves in the homes of various friends, displayed in restaurants, and at the International Auto Show in New York. He had also observed them at antique and classic car conventions in Pennsylvania, Connecticut, and New York and that these auto meets,

of which he attends 8 to 10 a year, are mainly attended by adults. It was his opinion that the imports before the court were not essentially toy items since they possessed costly detail and authenticity not necessary in the design of toys.

On cross-examination, the witness reiterated that, in toy designing, authenticity was unimportant, the emphasis being to exaggerate things in form or color. He testified that the only other items he had seen on the market with authenticity stressed were some hobby kits. He admitted that the imports could be used as toys by children but that he had never seen them so used.

The final witness called by the plaintiff was Mr. Fred Bronner, president of the plaintiff corporation. He testified that he had been in the toy and hobby line since 1945, starting his own business in 1954. While initially involved in directing sales activities, he admitted that in recent years he was familiar with sales from seeing orders and attending trade shows. He identified plaintiff's exhibits 16 through 24 as part of the Matchbox Series of imports which his firm has handled since 1954. These articles are conceded by plaintiff to be properly classified as toys. Based upon his personal past experience and his continuing contact with wholesale customers at trade fairs, he stated that the Matchbox items are bought equally by toy and hobby wholesalers alike while the Models of Yesteryear are primarily bought by the hobby dealers. Bronner testified that they have discovered that many toy jobbers have declined to handle these articles while, on the other hand, the Long Island Automotive Museum is a substantial customer. He felt that the presence of authentic details and a "lot of hand painting," together with the resulting cost differential, made the Yesteryear Series a different line of merchandise than the Matchbox items.

On cross-examination, Bronner stated he had personally made some sales during the May 1959 to October 1960 period but was unable to say how many. Most of the firm's sales are done by independent representatives who specialize in toy and hobby items but do not handle plaintiff's merchandise exclusively. When questioned as to price he explained that the Matchbox items retail at 49 cents each and the Yesteryear Series vary from 79 cents to $1.50 each and that the same ratio is maintained on sales at wholesale.

Bronner stated that the toy and hobby trades overlap so that the word "toy" appearing in a company's name does not mean they do not handle hobby items. By the same token, he admitted that the hobby wholesalers also buy their Matchbox Series.

Due to the stipulations entered into, and as further recognized by the defendant in its brief, plaintiff's burden of proof is in this case commensurate with its ability to refute the presumption of correctness

attending the toy classification rendered by the collector. As to this burden, defendant maintains, and we think rightly so, that plaintiff's evidence fails to establish the chief use of the imported merchandise as adult hobby items, pointing out that the instances of observation of actual use attested to, when compared with the volume of merchandise dealt in during the period of inquiry (74,745 dozen items sold to the wholesale market), is insufficient to indicate chief use by adults. Furthermore, the fact that the involved merchandise is primarily sold to hobby wholesalers was significantly undermined by the testimony of plaintiff's witness Bronner to the effect that the toy and hobby trades overlap so that nothing is necessarily proved by sales to one or the other.

While chief use by adults may not have been shown, plaintiff has argued that the "Models of Yesteryear" series are not toy items for the amusement of children as required by the provision of paragraph 1513. Certainly it is well recognized that not everything used by children is *ipso facto* a toy. *United States* v. *Calhoun, Robbins & Co.*, 21 CCPA 167, T.D. 46495; *United States* v. *Harry Grunberg*, 41 CCPA 1, C.A.D. 520. In particular, the court in the *Calhoun, Robbins & Co.* case, *supra*, after noting that the merchandise had been stipulated to be chiefly used by children over the age of six, stated that:

* * * In construing the language of the toy paragraph, *supra*, however, its full import is not determined in the ascertainment of *by* whom an article is chiefly used; it is necessary also to consider *for* what purpose it is used. * * * [Emphasis quoted.]

On the other hand, as plaintiff points out, a toy has always been considered a plaything. Thus, in *United States* v. *Louis Wolf & Co.*, 26 CCPA 243, C.A.D. 23, certain junior edition microscope sets, chiefly used by children between 12 and 16 years of age for home study, were held not to be toy items, the court saying:

Not everything a child uses is a plaything, even though he may get amusement from it. * * * [at p. 246].

and

* * * the interest which children display in the use of these microscope sets is not the character of "amusement" which a child gets from a toy or from an article which is essentially a plaything [at p. 249].

Again, in *F. F. G. Harper Co.* v. *United States*, 63 Treas. Dec. 948, T.D. 46423, the first division of this court held that metal parts intended for assembly into working models of miniature steam engines, locomotives, etc., and chiefly used by boys between 9 and 15 years of age, were not parts of toys within the meaning of paragraph 1513, stating:

* * * We are convinced that although the building of such models would be a pleasant pastime, it would not afford such amusement as

is afforded a child by playing with a ball or a top. Merriment and jollity would accompany a child's play with a ball or top; that is not the sort of amusement that would be derived from building a model engine with these parts. * * *

With the phraseology of the toy definition in mind, evidence has been produced to show an article's usage in mental development, *United States* v. *Louis Wolf & Co., supra* (microscope sets), or physical exercise, *United States* v. *F. W. Woolworth Co.*, 24 CCPA 338, T.D. 48770 (rubber balls), rather than as articles used chiefly to amuse. Another type of usage that has been consistently held, evidence permitting, to be without the scope of the toy provision is merchandise for ornamental, decorative, or display purposes. *United States* v. *Abercrombie & Fitch Co.*, 20 CCPA 267, T.D. 46060; *Krummell Imports* v. *United States*, 34 Cust. Ct. 354, Abstract 59010; *J. E. Bernard & Company, Inc.* v. *United States*, 27 Cust. Ct. 291, Abstract 55793; *S. S. Kresge Co.* v. *United States*, 25 Cust. Ct. 89, C.D. 1269. In these cases usage in the home in the manner of display or ornamentation was found to rebut the presumptive classification of the items as toys for the *amusement* of children.

It is towards this latter category of usage that plaintiff's evidence is directed. All of the testimony as to the observed use of the imported merchandise relates to its being displayed and/or collected and displayed in restaurants, at auto meets and auto show exhibitions, and on mantels, shelves, and bookcases of family homes. In addition, there was presented the testimony of two well-qualified specialists in model and toy items: Mr. Herbert Lozier, a recognized expert on all phases and on all kinds of model endeavors, testified to the effect that the "Models of Yesteryear" by Lesney of England are well made, authentic models of the vehicles they represent and that they are so considered by himself and other collectors alike; Mr. Herbert Jaffe, a toy designer by profession and a mechanical engineer by training, set forth the opinion that the articles at bar possessed detail and authenticity not required in toy designing and that, although they could be used as toy items, they were not essentially in the toy line. Of course, in these circumstances, the court is seeking evidence concerning the normal and intelligent use of the items and not simply their susceptibility to use. *United States* v. *Calhoun, Robbins & Co., supra.*

It is always true, and especially so in toy cases, that samples of the imported articles themselves can be negative, neutral, or affirmative and potent witnesses to the issue in dispute. Unlike the position taken by the defendant in this regard, we find that, in attention to detail, in handsomeness of design, and in historical content, the items under protest appear well suited for the purposes of collection and display. To paraphrase an observation made in an earlier case, their potential for

amusement appears to be subordinate to their predominant features for display or decoration. *Krummell Imports* v. *United States, supra.* On the other hand, the items introduced into evidence as part of the "Matchbox" series of vehicles are strikingly dissimilar in appearance and suggest as their prime function physical manipulation by the child user, i.e., as playthings.[4] We may observe, as was done in the *Louis Wolf* case, *supra*, that the construction of the articles at bar seems more elaborate than that ordinarily found in toys. Such an observation in this case, moreover, is corroborative of the record testimony on this point by plaintiff's toy-designer witness, Mr. Herbert Jaffe.

What is sufficient proof to discharge plaintiff's burden on the issue of chief use depends, of course, on the amount, kind, and persuasiveness of the evidence presented. As noted by the court in the HO equipment cases, the difference in results is related to the difference in the records produced. *United States* v. *Polk's Model Craft Hobbies, Inc., Lansen-Naeve Corp. et al.*, 47 CCPA 137, C.A.D. 746. While a consideration of geographical area is involved in chief use questions, inferences from unopposed evidence and deductions based on the nature of the exhibits can properly be drawn. *Abercrombie & Fitch Co., supra; The Fan Co.* v. *United States*, 25 Cust. Ct. 42, C.D. 1261. In the instant case, the testimony of the witnesses, especially as to observed use by members of national and international car clubs, as well as the character of the samples themselves, do not speak of purely local conditions so as to bar the inference that usage would be substantially the same everywhere.

The records presented in the cases cited previously wherein articles assessed for duty as toys were held to be in the nature of ornamental or display items are similar to the record before us in two important respects: First, in each instance evidence of observed use offered by the plaintiff was uncontradicted and unopposed; and second, the testimony given was supported by the sample merchandise. Consequently, in each instance, the evidence was found sufficient to establish a *prima facie* case for the plaintiff so as to shift the burden of going forward to the defendant. The approach used in these cases is perhaps best exemplified by the following statement of the court in the *Abercrombie & Fitch* case, *supra*:

All the testimony introduced is in harmony with and pointing toward the conclusion that they are not chiefly used for the amusement of children. It is not conclusive and under some circumstances might not be regarded as sufficient to constitute a *prima facie* case, but we think the testimony and the exhibit do make a *prima facie* case which

---

[4] The use of comparative samples is not new in this court, cf. *United States* v. *The Halle Bros. Co.*, 20 CCPA 281, T.D. 46077.

is sufficient to have required the Government, if it chose, to rebut the same.

Based on all the considerations discussed above, we hold that plaintiff has established, on the record in this case, a *prima facie* claim that the "Models of Yesteryear" miniature vehicles, whether or not mainly used by adults, are not toy articles as that term is defined in the statute and interpreted in the courts, but are, instead, properly dutiable at the rate of 19 per centum ad valorem under paragraph 397 of the 1930 Tariff Act, as modified, as manufactures of metal, not specially provided for. To the extent indicated, the protests are sustained and judgment will be rendered accordingly.

### CONCURRING OPINION

NICHOLS, Judge: I wish to dissociate myself from the court's observation that plaintiff's evidence fails to establish the chief use of the imported merchandise as adult hobby items because of the infrequent instances of observation of actual use in the testimony.

It is my view that persons concerned in an executive capacity with specifying, ordering, importing, promoting, and selling merchandise are presumed to know what its chief uses are and may give competent testimony on the subject. Instances of actual observation of use, on social occasions perhaps, are unimportant compared to what they have learned in the course of business. *F. B. Vandegrift & Co., Inc.* v. *United States*, 56 Cust. Ct. 103, C.D. 2617 (decided February 15, 1966). Acc.: *Cotton, Neill & Co. (Ltd.)* v. *United States*, 11 Ct. Cust. Appls. 278, 280, T.D. 39084. At page 91 of the record, the following occurs in the testimony of Mr. Bronner, president of the plaintiff:

JUDGE WILSON: Did I understand you to say that the Models of Yesteryear are used chiefly as collector's items, while the Matchbox Series are used principally for children to play with?

THE WITNESS: Yes, I think you can say this.

JUDGE WILSON: I understood you to make that statement.

MR. HARRIS: Your Honor, I don't believe this witness has been qualified to testify as to the actual use.

JUDGE WILSON: Well, a man who has been in the toy business since 1945, handled all types of toys, in my opinion, is capable of testifying.

CHIEF JUDGE OLIVER: Objection overruled.

In my view this ruling was correct, and I regret it is now departed from. Mr. Bronner's answer was competent. Not only did it establish *prima facie* the uses of the articles, but it would have done so even if Mr. Bronner had never once seen them in actual use.

By not following its own ruling, the court makes needlessly laborious the task of reaching, as it does, the right result. Worse, it countenances the tiresome practice of lugging in by the ears, instances

of personal observation of use, which must of necessity be too few to afford a valid sampling.