(C.D. 4156)

Louis Marx & Co., Inc. *v.* United States

United States Customs Court, First Division

(Decided December 24, 1970)

*Barnes, Richardson & Colburn* (*James S. O'Kelly* of counsel) for the plaintiff.
*L. Patrick Gray III*, Assistant Attorney General (*Peter J. Baskin*, trial attorney), for the defendant.

Before Watson, Maletz, and Re, Judges

Maletz, Judge: These consolidated cases concern the proper rate of duty on hand-painted figurines of the presidents of the United States. The figurines—which were manufactured in Hong Kong and imported via the port of New York—were classified under item 737.40 as "[t]oy figures of animate objects (except dolls), [n]ot having a spring mechanism, * * * [n]ot stuffed, * * * [o]ther" and as-

sessed with duty at 35 percent. It is the contention of plaintiff that the figurines are not toys and are properly classifiable in item 773.10 as figurines of plastic, with duty at the rate of 17 percent.

The parties have stipulated that the imported articles are "of plastics" within the meaning of item 773.10. Thus, the sole issue is whether or not the articles are "toys" as that term is defined in the tariff schedules.

The statutes with which we are concerned read as follows:

Classified under:

Schedule 7, Part 5, Subpart E of the Tariff Schedules of the United States—

Subpart E headnotes:

\*      \*      \*      \*      \*      \*      \*

2. For the purposes of the tariff schedules a *"toy"* is any article chiefly used for the amusement of children or adults.

\*    \*    \*    \*    \*    \*    \*

Toy figures of animate objects (except dolls):
  Not having a spring mechanism:

\*    \*    \*    \*    \*    \*    \*

  Not stuffed:

\*    \*    \*    \*    \*    \*    \*

| 737.40 | Other _____ | 35% ad val. |

Claimed under:

Schedule 7, Part 12, Subpart C of the Tariff Schedules of the United States—

| 773.10 | Plaques and figurines, of rubber or plastics___ | 17% ad val. |

Each president figure is about two and one-half inches high and is mounted on a bronze-colored platform on which is inscribed the name of the president, the years in which he served in the presidency, and his order in the presidential roll; e.g., first, second, etc. Each of the figures represents the artist's conception of what the president looked like and is somewhat similar to the features of the president it depicts but not an exact replica.

Plaintiff, a manufacturer of toys and novelties, became involved with the articles in 1963 when it was approached by a sales promotion agency that was interested in promoting president figures in supermarket chains. After a period of design and sample production, a national supermarket chain agreed to promote the president figures through its stores and then became plaintiff's first and sole customer

for the figures. Later, in 1966, Pretested Promotions, Inc. of New York City (Pretested)—a concern which (among other things) sells continuity promotions across the country—succeeded the supermarket chain as the sole distributor of the figures.

Pretested supplies the president figures to various supermarkets throughout the country as a promotional item. As part of this promotion, the figures are displayed and put on sale in the participating supermarkets over a period of seven to ten weeks. During the first week, a customer who purchases $5.00 or more of groceries receives free the figure of George Washington and can purchase figures of the second, third, fourth and fifth presidents at a cost of 19 cents each. During the second week of the campaign, the figure of John Quincy Adams is given away free with a $5.00 purchase, and following four president figures may be purchased for 19 cents each. This process is repeated over the weeks of the campaign until eventually the customer has acquired a complete set of president figures.[1]

In connection with the promotion campaign, a complete set of president figures is displayed in the supermarket on a white styrofoam four-tiered reviewing stand supplied by Pretested. Packed in with the stand is a booklet—also supplied by Pretested—that contains a brief historical and biographical sketch of each of the presidents. The reviewing stand and booklet may be purchased at the supermarket for 59 cents. During the period of time involved here, Pretested has sold some 500,000 of these stands to the supermarkets.

Approximately 90 percent of the people who start collecting the president figures complete the set. Thus, during the period in issue, Pretested shipped 25,000,000 president figures and, at the time of trial, its inventory of returned merchandise was some 2,000,000 pieces.

Beyond this, one of the witnesses[2]—the promotion manager of Pretested—testified to the following effect: He has two complete sets of the president figures in his home where they are displayed on shelves in his sons' bedrooms. The children do not play with the figures. One of his sons has used the figures as a reference for the order and dates of terms of office, which (as previously indicated) appear at the base of each of the president figures. The witness' wife is a fourth-grade teacher and has a set of president figures on display in her

---

[1] Concurrently with the promotion of the president figures in the supermarkets, Pretested sponsors on their behalf an essay contest in local elementary schools. The subject of the contest is "The President as a Leader" and each child is required to choose a president and write an essay in line with that theme. The essays are graded by teachers employed by Pretested and the winners are awarded an expense-paid trip to Washington, D.C., where arrangements are made for them to meet their representatives in Congress and visit points of interest.

[2] Three witnesses testified at trial—all on behalf of plaintiff. Defendant did not present any testimony.

classroom and has used them in the course of her instruction on American history. Neither the witness, his wife nor his sons have ever played a game with the figures. He estimated that he has personally observed 70,000 president figures in such places as offices of Senators and Congressmen.

Another witness called by plaintiff—who is the sales manager of plaintiff's domestic line—provided the following testimony: In his view, a toy is an item primarily designed to amuse. The term "play value" is used in the toy industry to describe the amount of fun or amusement a toy item will provide. All toys must have some "play value." The imported president figures are not sold by the toy salesmen of plaintiff nor are they sold through the normal toy channels of the industry. In the witness' opinion, the president figures do not fall into the category of toys. They have no "play value," and are merely statuettes of historical figures or collector's pieces which may have some educational value. The subject to which they relate—the presidents of the United States—is not appropriate for a toy item. "You wouldn't make a mechanical George Washington, or a battery-operated Lincoln."

The witness further testified that several years before a toy company sold a toy figure of Senator Barry Goldwater which was about three and one-half inches in height. However, he added, it was quite different from the president figures before the court. For the Goldwater figure was distorted and had an enlarged head on a very small body.

Finally, the witness indicated that there was one other set of president figures being sold in the United States during the time in question by a firm known as the J & J Company. From his examination and knowledge of the J & J figures, the witness stated that there was nothing in their construction, design or character which would indicate a use different from that of the president figures before the court.

Coming now to the legal aspect, we have previously noted that under the tariff schedules, a "toy" is any article chiefly used for the amusement of children or adults. However, it is settled law that not everything that amuses is a toy; for an article to be classified as a toy for tariff purposes, it must be a plaything. E.g., *Topps Chewing Gum, Inc.* v. *United States*, 63 Cust. Ct. 431, C.D. 3930 (1969) (appeal pending); *Wilson's Customs Clearance, Inc.* v. *United States*, 59 Cust. Ct. 36, 39, C.D. 3061 (1967). Thus, articles chiefly used for ornamental, decorative or display purposes have been held to be outside the scope of the toy provisions. E.g., *Fred Bronner Corp.* v. *United States*, 57 Cust. Ct. 428, 436, C.D. 2832 (1966). And in making this determination, samples of the merchandise have consistently been

found to be telling evidence of the character of the article in this respect, E.g., *United States* v. *Abercombie & Fitch Co.*, 20 CCPA 267, T.D. 46060 (1932) (hand-carved animals) ; *S. S. Kresge Co.* v. *United States*, 25 Cust. Ct. 89, C.D. 1269 (1950) (hand-painted figures of farmers and peasants mounted on stands) ; *J. E. Bernard & Company, Inc.* v. *United States*, 27 Cust. Ct. 291, Abstract 55793 (1951) (celluloid reindeer) ; and *Eskil Halle* v. *United States*, 27 Cust. Ct. 348, Abstract 55996 (1951) (hand-painted horse and rooster).

Against this background, the evidence in this case proves that the president figures fall squarely within the category of ornamental or display articles which have been held not to be playthings for the amusement of children or adults. It is clear from the record that the president figures were not designed as toys, are not advertised as toys in the trade, and are not sold and distributed through normal toy channels. One witness with 22 years of experience in selling toys testified that the imported items possessed no "play value" and were not considered to be toys by the industry. Another witness who has sold approximately 25,000,000 of the figures and has observed 70,000 of them in use indicated that they were utilized as a history aid and for display purposes—as distinguished from play purposes.

The testimony of plaintiff's witnesses is entitled to weight. It not only stands uncontradicted but comes from persons in the trade who are presumed to know the uses of the merchandise that they sell. See *Klipstein* v. *United States*, 1 Ct. Cust. Appls. 122, T.D. 31120 (1910) ; *F. B. Vandegrift & Co., Inc.* v. *United States*, 56 Cust. Ct. 103, C.D. 2617 (1966).

Finally, an examination of the importations not only confirms the testimony of the witnesses but is itself strongly persuasive of the fact that the president figures are not playthings used for the purpose of amusement. For such examination shows that the importations are finely designed hand-painted reproductions of the presidents of the United States, mounted on small platforms. Individually and collectively, the figures are essentially passive and uncomical. They lack moving parts and basically are incapable of functioning as a plaything in normal, intelligent use. See e.g., *Wilson's Customs Clearance, Inc.* v. *United States, supra*, 59 Cust. Ct. at 40–41. In the words of an earlier decision of this court: "[I]n attention to detail, in handsomeness of design, and in historical content, the items * * * appear well suited for the purposes of collection and display." *Fred Bronner Corp.* v. *United States, supra*, 57 Cust. Ct. at 436. In short, the imports are what they appear to be: figurines or statuettes for ornamental, collection or display purposes.

The protests are sustained and judgment will be entered accordingly.