**AMERICAN ASTRAL CORPORATION**

v.

**UNITED STATES.**

C.D. 3827;  Protest 67/19457–696–67.

United States Customs Court,
First Division.
May 22, 1969.

Barnes, Richardson & Colburn, New York City (James S. O'Kelly, New York City, of counsel), for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (Owen J. Rader, New York City, and John A. Winters, trial attorneys), for defendant.

Before WATSON, MALETZ, and RE, Judges.

MALETZ, Judge:

The issue in this case involves the proper tariff classification of articles described on the invoice as men's gloves, which were imported from Japan and entered at the port of New York. The articles were classified by the regional commissioner of customs under item 704.85 of the Tariff Schedules of the United States (19 U.S.C. § 1202) as gloves of man-made fibers, knit, and were assessed with duty at the rate of 25 cents per pound plus 32½ percent ad valorem.

Plaintiff makes two claims alternatively. First, it contends that the gloves are in fact tennis gloves and properly dutiable at 8 percent ad valorem under item 734.88 as lawn-tennis equipment, other. Second, it argues in the alternative that the gloves, if not lawn-tennis equipment, are classifiable under item 735.05 of the tariff schedules as gloves specially designed for use in sports, with duty at the rate of 15 percent ad valorem. We hold that the government's classification is erroneous and that the imported gloves are properly classifiable under item 734.88 as lawn-tennis equipment.

The relevant statutory provisions are as follows:

Classified under:

Schedule 7, Part 1, Subpart C, Tariff Schedules of the United States:

Subpart C headnotes:

1. For the purposes of this subpart—

(a) the term *"gloves"* includes all gloves and mittens designed for human wear, except boxing gloves, golf gloves, baseball gloves, and other gloves specially designed for use in sports * * *

\* \* \* \* \* \* \*

Gloves and glove linings, of textile materials:

\* \* \* \* \* \* \*

Of man-made fibers:

704.85      Knit ..............................25¢ per lb.

Claimed under:                + 32.5% ad val.

Schedule 7, Part 5, Subpart D, Tariff Schedules of the United States:

Subpart D headnotes:

1. This subpart covers equipment designed for indoor or outdoor games, sports, gymnastics, or athletics, but does not cover—

\* \* \* \* \* \* \*

(v) other wearing apparel, other than specially designed protective articles such as, but not limited to, gloves, shoulder pads, leg guards, and chest protectors

\* \* \*

\* \* \* \* \* \* \*

Lawn-tennis equipment, and parts thereof:

\* \* \* \* \* \* \*

734.88     Other ................................8% ad val.

\* \* \* \* \* \* \*

735.05    Boxing gloves, and other gloves, not provided for in the foregoing provisions of this subpart, specially designed for use in sports ..15% ad val.

———◆———

We consider first the record which consists of the testimony of one witness for plaintiff, one witness for defendant, two samples of the imported gloves, a circular distributed by plaintiff to the trade, and two advertisements of the importations appearing in tennis publications. Plaintiff called as its witness its president and chief executive officer in which capacity he supervises the company's entire operation. His testimony was to the following effect: Plaintiff is in the business of importing and selling gloves and raincoats. It imports two types of gloves: dress gloves and sporting gloves. The dress-glove category includes the normal type of everyday glove worn either to protect against the cold or as part of wearing apparel. The sporting-glove variety includes a variety of gloves, such as golf gloves, ski gloves, shooting gloves, bowl-

ing gloves, and many others. The sample exhibits, he stated, represent the exact manner in which the gloves in question were imported, i. e., one glove to a package, either a right hand or a left hand. The shipment contained a total of 90 dozen right-hand gloves and 10 dozen left-hand gloves.

As background, the witness pointed out that in 1957 or 1958 he conceived the idea of a glove to protect the hand for use in tennis and designed the gloves in question. While he has had no formal training in glove design, he has designed several varieties of gloves, such as fishing gloves, bowling gloves and skeet gloves. "In fact," his company "continue[s] to look for gloves for various sports." "I seek reasons for gloves." His modus operandi is to design a glove from an idea he gets, whereupon he sketches out the glove and has it manufactured from the sketch.

The witness testified that he designed the glove in question for tennis. He explained that at the beginning of the tennis season the hand develops calluses and sores between the fingers from the rigorous action of the racquet. Also, the strenuous activity of tennis produces a great deal of perspiration which causes the racquet to slip in the hand. Support for the wrist is another problem area. The gloves in question, therefore, were designed with these problems in mind, and incorporate a number of unique features. The glove backing is made of an absorbent material—largely terry cloth [1]—which can be used by a tennis player to wipe his forehead. The palm is made of lambskin which has been specially treated to absorb moisture and to prevent slippage of the racquet in the hand. Elastic has been placed in the wrist area of the glove to give support to the wrist. To further protect against calluses and sores, the fingers and a part of the palm of the gloves have holes to permit air to pass through, and the area of the glove between the fingers, technically known as the fourchette,

has been made of a stretchable material to permit the expansion and contraction (i. e., flexing) of the hand. The gloves are advertised in the trade as tennis gloves and are sold throughout the United States to sporting goods stores, sporting goods departments of department stores, and professional tennis shops. They are sold by plaintiff in units of one dozen, either right hand or left hand. They are not sold in pairs. Similarly at retail they are sold singly and not in pairs, with a right-handed player using a right-hand glove and a left-handed player using a left-hand glove. Seeded tennis players have used the glove, although the witness did not know if they use it now.

The gloves in question are entirely different in design from other types of sporting gloves, such as golf gloves and bowling gloves. The golf glove, for example, is designed for a different type of support and a harder type of leather is used. In addition, a golf glove is often made with half fingers, whereas a tennis glove always has full fingers. A bowling glove is different, too, since it is designed with half fingers so that the fingers can enter the holes in the ball.

The imported gloves also differ greatly from dress gloves. The witness has never seen or sold a dress glove with a terry-cloth back. He has never seen a dress glove designed with holes in the fingers and palms to permit ventilation, nor does his company sell dress gloves that have buttons at the wrist, as do the gloves in question. Moreover, a dress glove is designed to fit the hand closely, to give it the appearance of being slender, and to make the hand look graceful. The gloves in question are not so designed. They are a thick, bulky glove and extend beyond the thickness or width of the fingers. Also, the glove in question is designed more fully at the back of the hand and will "blouse," i. e., will come up. Lastly, the dress gloves are always sold in pairs, whereas the

---

1. More particularly the backing is composed of 65 percent cotton and 35 percent nylon.

gloves here are sold in single units, either right hand or left hand.

The witness further testified (on cross-examination) that while the gloves in question could theoretically be used for a number of uses, they are not designed for, nor are they suitable for, use in other sports such as archery, bowling or handball. He stated that the position of the button on the palm section of the wrist of the glove is designed so as not to interfere with the performance of the tennis player. In this connection, he testified that tests conducted by his company had shown that when the button and tab were placed on the back, the tab would frequently open because of the throw. He stated also that placement of the button on the back would interfere to a certain extent with the player using the back of the glove to wipe his forehead. He testified further that a suede dress glove would not give the same protection to the player as the tennis glove. He added that a suede glove would not absorb moisture and that the palm of such a glove would constrict the hand of the player. Finally, he testified that the glove is not necessary for the game of tennis in the same manner (for example) as a baseball glove is necessary for a game of baseball.

Defendant called as its witness the tennis professional at the West Side Tennis Club in Forest Hills, New York, New York. He has been a tennis professional for 35 years and once ranked No. 5 as a professional. He has been the coach for the Swedish Lawn Tennis Association, and tennis coach at several universities. He has published a number of articles on tennis in various pamphlets and publications. He is a past president of the U. S. Professional Lawn Tennis Association and is now its executive director. His testimony was to the following effect:

He has seen items such as the gloves in question and has one in his tennis pro shop. He purchased that glove from a retail tennis store in New York City but has never used it to play tennis.

His sole familiarity with the glove consisted of having tried it on at the request of defendant's counsel and having swung a racquet a few times. He stated that it was for tennis, and that he could play the game wearing. the glove, but that he would not use it to play tennis since "I don't believe I would need any help there, and if I did I don't believe I could quite get the feel, although that's just kind of a generality." He could not testify whether he could get the "feel" of the game by wearing the glove because he had never hit the ball when wearing it.

In the past, he has seen gloves of a design different from the gloves here used by tennis players. He remembered selling a glove to a person who was suffering from a skin ailment, but could only vaguely describe the glove which he called a golf glove for a left-handed player. He could not remember ever seeing the imported gloves used by tennis players. On the basis of having worn the glove in question only briefly while swinging a racquet a few times, he did not believe that the elastic wrist band on the glove would support the wrist since, in his view, the elastic band is a little bit too low for that purpose. In his opinion, the glove is not needed or required for the safe, proper and efficient playing of the game of tennis or any other sport.

On cross-examination the witness agreed that there was nothing about the glove that would prohibit it from being used in the game of tennis. He did not believe that the terry-cloth back of the glove would help much in absorbing perspiration, but agreed that it would be useful if the player could wipe his forehead with the back. When asked whether the glove would be more suited to a tennis player than a golf glove, he said that not having used either type of glove, he could not give an answer or express an opinion. He conceded, however, that the imported glove might help prevent sores and blisters on the hand of the tennis player, but, in his opinion, would not help with the perspiration problem.

He would not recommend the glove to his pupils.

This brings us to the legal principles involved. As we have seen, the imported gloves were classified by the government under item 704.85 of schedule 7, part 1, subpart C. Headnote 1(a) covering that subpart (which has been quoted previously) defines the scope of the term "gloves" as used in that section, *and excludes therefrom all gloves specially designed for use in sports,* such as boxing gloves, golf gloves, and baseball gloves. Such gloves are provided for in *part 5, subpart D of schedule 7.* Headnote 1 of the latter section (also quoted before) states that that subpart covers equipment designed for sports, gymnastics, athletics, and indoor or outdoor games, including, by name, *specially designed gloves* and other protective articles.

The *Explanatory Notes* published by the Tariff Commission dealing with part 5, subpart D of schedule 7 indicate that many of the articles now covered therein were formerly provided for in paragraph 1502 of the Tariff Act of 1930. However, the *Explanatory Notes* also reveal that it was the intention of the Tariff Commission to expand the scope of the subpart and to include therein *all* equipment (other than luggage) specially designed for use in sports and games. Thus, the *Tariff Classification Study—Schedule 7* (Nov. 15, 1960) states (p. 280):

> The provision in paragraph 1502 for balls and "all clubs, rackets, bats, golf tees, and other equipment such as is ordinarily used in conjunction therewith" is interpreted to embrace only pieces of equipment that are actually used in the process of playing the particular game or sport and does not include, for example, articles such as carts of special design used to transport golf bags around the course. The provisions of the proposed subpart are

not so limited and would include all equipment (other than luggage) specialized for use in connection with the various games and sports.

On this aspect, it is to be observed by way of background that under paragraph 1402 of the Tariff Act of 1922 covering sporting equipment,[2] the term "equipment" was construed to include only those articles that were *needed or required* for the safe, proper and efficient playing of the sport. Cruger's (Inc.) v. United States, 12 Ct.Cust.App. 516, 519, T.D. 40730 (1925). In *Cruger's,* polo hats and polo helmets were classified as articles of wearing apparel. The importer protested claiming that the articles were properly classifiable as sporting equipment. The entire record consisted of a stipulation between the parties that the polo hats and helmets are ordinarily worn by the player when engaged in playing polo, and that that constituted their chief use. The court affirmed the denial of the protest on the ground that the record did not disclose that the articles were ordinarily used and needed or required for the proper, efficient playing of polo, or for the protection of the player. According to the court, "[a]rticles which are not necessary or requisite for a special purpose or service and the use of which is dictated by fad, fancy, or fashion, can not * * * properly be called equipment." Id. at 519. Judge Bland concurred with the result in *Cruger's* but expressed the conviction that the term "equipment" should not be limited to those articles which are so essential or necessary to the game as to make it impossible to play the game without the article. Thus, he stated (*id.* at 519–520):

> If the ruling opinion attempts to lay down a rule for future guidance in connection with classification under paragraph 1402, it is not, in my opinion, sufficiently definite. I do not

2. Paragraph 1402 provided for certain-named balls "and all other balls * * * designed for use in physical exercise or in any indoor or outdoor game or sport, and all clubs, rackets, bats, or other equipment, such as is ordinarily used in conjunction therewith in exercise or play * * *."

like the use of the word "necessary" unless its use be defined or limited. "Necessary" might convey the idea that the article was indispensable to the game or exercise. I do not think Congress meant to limit the equipment to those articles which are so essential or necessary to the game as to make it impossible to play the game without the article; nor do I think, on the other hand, that it meant to include a great many articles of surplus or incidental equipment which may be appropriate to use in the game or exercise, but which are not so dedicated to, or designed for the use in the game or exercise, as to bring them within the meaning of the words "other equipment" as used in the paragraph.

Later, in a case arising under paragraph 1502 of the Tariff Act of 1930—which paragraph (so far as the present discussion is concerned) was similar to paragraph 1402 of the Tariff Act of 1922—this court held that if an article served no other purpose but to *aid* in a safer and more efficient game, it came within the designation of "equipment" as contemplated by paragraph 1502: Slazengers, Inc. v. United States, 33 Cust.Ct. 338, 339, Abstract 58323 (1954).

The Tariff Classification Study (quoted previously) indicates a congressional intent to liberalize the sports equipment provision still further so as to include not only equipment which is necessary to play the game but also equipment specially designed for use in connection with the game. For example, not only would golf balls and golf clubs be included within the provisions for sporting equipment, also included would be items such as "carts of special design used to transport golf bags around the course" —which are not indispensable to the game itself.

In this setting, the question here is not whether the imported gloves are needed or required for the game of tennis, but rather whether they are specially designed for use in the game of tennis. As to this, plaintiff argues that the imported gloves are not of the type provided for in item 704.85 (under which they were classified), but are specialized tennis equipment and are therefore properly dutiable as lawn-tennis equipment under item 734.88. Defendant argues, on the other hand, that the record shows that the gloves in question are not specialized tennis equipment since "they undoubtedly can be used as wearing apparel." It adds that the gloves do not possess any unusual characteristic which dedicate them to the game in such a way as to distinguish them from any ordinary glove that might be worn while playing tennis, but rather are normal gloves that could be used for many purposes. We think the record clearly supports plaintiff's position.

Closely in point on this phase is Slazengers, Inc. v. United States, *supra*, 33 Cust.Ct. 338. That case involved a shipment of leather gloves which the collector had classified under the general glove provision of the Tariff Act of 1930, paragraph 1532(a), according to length and type of construction. Plaintiff claimed that the gloves were golf gloves and properly dutiable as golf "equipment" under paragraph 1502. The court sustained the claim.

The evidence established that the gloves were specially designed for and exclusively used by people playing the game of golf. Further, the court found several characteristics of the imported gloves, as follows, which distinguished them from the "ordinary glove usually worn as apparel":

(1) The imported glove was usually sold singly and only occasionally in pairs.

(2) The imported glove had perforated holes on the back to permit circulation of the air and prevent perspiration of the hands, enabling the golfer to hold the golf club tightly and avoid slipping.

(3) The button on the imported glove was positioned in the back to prevent interference to the wearer while playing golf.

,(4) Elastic was sewn inside the imported glove to hold it firmly to the wrist and to facilitate a proper grip of the golf club.

After reviewing the above factors, the court concluded (33 Cust.Ct. at 339):

> It is fair to say, on the basis of the evidence before us, that the gloves in question, by their peculiar design and construction, and their exclusive use, serve no other purpose but to aid in a safer and more efficient game of golf. The articles, therefore, are within the designation of "equipment," as contemplated by the provisions of paragraph 1502, as amended, *supra*, and within the broad interpretation of the said designation as enunciated in the case of Cruger's (Inc.) v. United States, 12 Ct.Cust.Appls. 516, T.D. 40730.

The gloves here in controversy possess similar distinguishing characteristics which the court in *Slazengers* found sufficient to remove the golf gloves there in issue from the category of dress gloves or apparel gloves and to place them within the category of "equipment." Thus:

(1) The gloves here in question are sold *only* in single units and not in pairs.

(2) The gloves have been perforated with holes to permit air circulation and prevent perspiration.

(3) The button on the glove has been placed in such a way as to prevent interference to the player.

(4) Elastic has been incorporated in the wrist of the glove to give a snug fit and to support the wrist of the player.

There are a number of additional features which make the imported gloves especially suited and designed for use in the game of tennis. The absorbent back and specially treated lambskin palm are designed to prevent perspiration. The leather palm of the glove also aids in preventing slippage of the racquet and protects the player's hand from the calluses and sores that are common at the beginning of the tennis season. Also the fourchette area of the glove has been specially designed with flexible material to permit the expansion and contraction of the hand.

█ It is true that the imported glove can have other possible uses. No doubt the same is true of a golf glove, or for that matter, a baseball bat. For example, a golf glove can conceivably be used for gardening, for croquet, and a variety of other purposes. And conceivably a baseball bat can be used as a club or as a partial substitute for a hammer. But the fact that fugitive uses are thus possible scarcely means that an item is thereby precluded from being classified as sporting equipment. For the statutory designation of "equipment" is satisfied once it is shown that the article is specially designed for use in the game or sport. And in this connection the testimony and exhibits before us show clearly that the imported articles are not normal gloves, but rather are gloves that have been specially designed for use in the game of tennis as an aid and protective device for the player.

█ An additional consideration worthy of mention in assessing the record is that defendant's witness was not qualified to dispute plaintiff's evidence. True, he has been a tennis professional for 35 years, but, by his own testimony, he disqualified himself as an expert on the gloves in question. He admitted that he had never played a game of tennis with the glove, and that his only contact and familiarity with it consisted of briefly trying it on and swinging a tennis racquet. In sum, the witness' lack of experience and familiarity with the glove make his testimony concerning its suitability for use in the game of tennis of little probative value.

In conclusion, we hold that the imported gloves are properly classifiable as tennis equipment under item 734.88 of the tariff schedules.[3] The protest is sustained, and judgment is entered accordingly.

3. Since the gloves are "lawn-tennis equipment," they are "provided for" in item 734.88 and hence foreclosed from classification under item 735.05 as alternatively claimed. See *Wico Corporation v. United States*, 282 F.Supp. 798, 801, 60 Cust.Ct. 324, 328–329, C.D. 3376, (1963).