(C.D. 4208)

AUTOMOTIVE TIRE SERVICE, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided on rehearing [C.D. 4083] April 29, 1971)

*Walter E. Doherty, Jr.*, for the plaintiff.
*L. Patrick Gray III*, Assistant Attorney General (*Patrick D. Gill*, trial attorney), for the defendant.

RE, Judge: This is a rehearing held pursuant to an order granted January 11, 1971 upon the application of the defendant for the sole purpose of obtaining a clarification of the decision and judgment entered herein on October 5, 1970, *Automotive Tire Service, Inc.* v. *United States*, 65 Cust. Ct. 230, C.D. 4083 (1970). The defendant's application did not, in any way, relate to the merits of the decision.

These three protests, consolidated for trial, raise the question of the proper classification, for customs duty purposes, of certain pneumatic tires imported from England. The district director classified the tires as "Pneumatic tires: * * * [o]ther" under item 772.51 of the Tariff Schedules of the United States, and pursuant thereto imposed duty at the rate of 8½ per centum ad valorem. Plaintiff has protested, and claims that they should have been classified under item 772.50 of the tariff schedules as "Pneumatic tires: * * * [d]esigned for tractors provided for in item 692.30 or for agricultural or horticultural machinery or implements provided for in item 666.00", as amended by the Tariff Schedules Technical Amendments Act of 1965. Under the claimed provision of the tariff schedules the imported merchandise would be entitled to entry free of duty.

The following are the pertinent statutory provisions:

Claimed under:

"Tires, and tubes for tires, of rubber or plastics:

Pneumatic tires:

| | | |
|---|---|---|
| 772.50 | Designed for tractors provided for in item 692.30 or for agricultural or horticultural machinery or implements provided for in item 666.00_____ | Free" |

Classified under:

"Tires, and tubes for tires, of rubber or plastics:

Pneumatic tires:

\* \* \* \* \* \* \*

| | | |
|---|---|---|
| 772.51 | Other _____ | 8.5% ad val." |
| "666.00 | Machinery * * *, and agricultural and horticultural implements not specially provided for, and parts of any of the foregoing _____ | Free" |
| "692.30 | Tractors suitable for agricultural use, and parts thereof_____ | Free" |

In broad terms the question presented may be said to be whether the imported tires in question should properly be classified under item 772.50, as "Tires * * * [d]esigned for tractors provided for in item

692.30 or for agricultural or horticultural machinery or implements provided for in item 666.00", and hence entitled to entry free of duty, rather than as other tires under item 772.51 with duty at the rate of 8.5 per centum ad valorem.

In its brief the defendant quotes from the case of *United States* v. *Enrique C. Lineiro*, 37 CCPA 5, C.A.D. 410 (1949), wherein the Court of Customs and Patent Appeals stated that "[i]t is trite to say that in customs litigation, the importer has the burden of proving not only that the classification made by the collector is wrong, but he must further show affirmatively the correctness of his own contention."

The quoted statement, which expresses the dual burden of the importer in a customs classification case, cannot be disputed. The question in each case, often a difficult and a close one, is whether from an evidentiary standpoint the plaintiff has met this burden, and has overcome the presumption of correctness that attaches to the classification made by the customs officials. *Joseph E. Seagram & Sons, Inc.* v. *United States*, 30 CCPA 150, 157, C.A.D. 227 (1943), and cases cited therein. See also *Hayes-Sammons Chemical Co.* v. *United States*, 55 CCPA 69, 72, C.A.D. 935 (1968).

In the case at bar the defendant maintains that the plaintiff has not met its burden of proof. Specifically, the defendant asserts that plaintiff has failed to offer any competent evidence to show that the controverted tires were "[d]esigned for" the particular tractors or machinery contemplated by the claimed provision of the tariff schedules. Defendant, consequently, has highlighted "specific weaknesses in plaintiff's evidence", and concludes that plaintiff "has failed to prove that the tires were designed for tractors suitable for agricultural use or for agricultural and horticultural implements. Specifically, plaintiff has not given sufficient and competent evidence that the tires were so designed."

In its brief, defendant brings to the court's attention another inadequacy or failure of plaintiff's case, and asserts that "[p]laintiff has offered, in the nature of evidence, little else than mere casual reference to various tires listed on the invoices attached to the protests in question." As an example, defendant recalls the testimony of Mr. George K. Feinberg, one of plaintiff's witnesses, who, referring to the first invoice page attached to protest 68/18001, stated that "these particular tires were imported for farm use." Defendant also refers to the testimony of plaintiff's other witness, Mr. Arthur E. Hill, who, when asked about two of the tires appearing on that same page of the invoice, responded that "those would be for farm wagon tires."

Although perhaps inartistically presented, there is no doubt as to the merchandise that is in dispute in the three protests at bar. Indeed,

as to one of the invoices, the point was clarified by a specific question posed by the trial judge. The possible cause of confusion is indicated by the defendant in the helpful appendix that it has attached to its brief. It may have resulted from plaintiff's cross referencing of specific tires in the invoices in question with two of plaintiff's exhibits, which consisted of brochures of the Dunlop Tire and Rubber Co. of England describing that company's agricultural and tractor tires.

Since to defeat plaintiff's claim in its entirety, on the ground that it has not properly identified or described all of the various items of the controverted merchandise, would unduly extol technical accuracy and procedural niceties over the demands of justice, the court has examined all of the invoices to determine which tires are embraced within plaintiff's claim. This examination shows that no evidence was submitted as to those tires listed as 750-14 on the invoice in protest 68/18001, and, which according to a certain portion of the testimony of Mr. Feinberg, appear on page 15 of plaintiff's exhibit 2. If it was intended to include these tires in protest 68/18001, the classification, as to these tires, is sustained and the protest is overruled. Defendant would also place in this same category those tires listed as 820-15 on the invoice in protest 68/18001. The court does not agree, for as to these 820-15 tires, Mr. Feinberg testified that they were "6 and 8 ply tractor covers", and that they appeared on page 507 of plaintiff's exhibit 1. On the page indicated by the witness in exhibit 1, there is depicted a Dunlop Fieldmaster "Rear Tractor Tyre".

As to protest 68/50762, there is excluded from consideration all of the tires represented on invoice number 4867/2. As to these tires, Mr. Feinberg would seem to agree that they are not embraced within the protest. Although he first testified that he was making no claim as to the tires on the "fourth page" of the invoice and stated that "they are not duty free", he later testified that "[o]n invoice No. 3 we are not claiming any duties. In other words, we are paying the duties." The apparent discrepancy or confusion as to page number is further indicated by the comment of the trial judge, who, with specific reference to protest 68/50762, stated:

> "This is the invoice as to which page 4 of the invoice is not a part of it, so it is understood he [Mr. Feinberg] is only dealing with the first two pages."

As to all of the tires listed or described on invoice number 4867/2 in protest 68/50762, and referred to above, the classification of the district director is affirmed and the protest is overruled.

In addition to various exhibits, consisting of a Dunlop I. R. 2 tire illustrative of one type of tire described on the invoices in issue, and several brochures or catalogues, the record in this case consists of the

testimony of five witnesses, two who testified for plaintiff and three for the defendant.

Plaintiff's first witness, Mr. Feinberg, is chairman of the board of the plaintiff corporation. Although the plaintiff corporation was organized in 1946, the witness has been in the tire business for over 40 years. He has gone to England on business nearly every year since 1948, and during one of these trips he purchased the tires in question from the Pneumatic Tire Co. of High Wycomb, England, a subsidiary of the Dunlop Tire Company of England. He stated that the tires described on the invoice in protest 68/18001 were "downgrade" tires, i.e., tires which would be called "seconds" in the United States, which cannot be sold on the English market because of their safety standards. In England the tires would be called "remolded quality" whereas in the United States they would be referred to as "retreaded" or "recapped". These tires, he explained, are "down-graded" because inspection has revealed defects, and, since they are not safe for highway use, they are not so used. The tires are not used tires that have been "remolded", but "new down-graded" tires that have been "remolded" or "retreaded".

As to protest 68/50762, Mr. Feinberg, as indicated previously, does not contest the classification of the tires listed on invoice number 4867/2, but stated that all of the other tires are "tractor implement tires". As to all of the tires on the first two invoices of protest 68/57890, he testified that they were either farm tires for agricultural use or "down-graded, remold quality tires."

Mr. Feinberg, who has bought and sold these tires for many years, stated that since the "down-graded" tires in England were unfit for highway use, after being "remolded", or "retreaded", they were sold for agricultural purposes. Based upon his vast experience in the tire business, he testified that "[b]y the design of the tire, design of the tread, the identification of the tires * * * the type of bead, the type of construction, how we bought them, how we compared prices against other farm tires * * * and what they were sold for and what they were purchased for", he knew that "[t]hey are used and sold for farm use." Mr. Feinberg testified that "[t]hese particular tires were imported for farm use", and proceeded to differentiate between farm or agricultural tires, and highway or passenger car tires.

Mr. Hill, plaintiff's second witness, is warehousing manager for the plaintiff. He has been in the tire business for twenty-five years. He started at the bottom, and has been in every phase of the business, "repairing tires, recapping tires, grading tires, buying tires, selling tires, shipping tires." He was familiar with the importations and explained the difference between agricultural, as distinguished from industrial tires, as follows:

"A tractor tire is made for a specific purpose like an industrial tire. They differ accordingly. A tractor tire is made to go in soft dirt. A tractor tire is made to clean itself in soft dirt. That's why you have very shallow bars on a tractor tire. You have very high, cleated bars because you travel in dirt that's probably been cut up to a foot or two in depth. You don't have any weight on it to be concerned with, so you don't need the plies on the tires.

"An industrial tire, even though the size may be the same * * * [is] a tire with a shallow tread * * * [without] a high, cleated tractor tread on it. A tractor tread can go four or five inches in depth. You take your industrial tire, it might go one inch in depth, it isn't open to clean itself because it doesn't have to. The tread doesn't have to clean itself off. It's not in soft dirt all the time. The tread is thick; it's compounded with a different type of rubber to take abuse. It is built with heavier plies to handle weight, which a tractor doesn't have.

"A tractor tire goes on a specific type of a wheel. It has a very narrow bead. It has, probably, a bead ½, ¾ inch in thickness because it goes over a wheel that is a one-piece wheel, the same as an old clincher wheel; it's just put on with force. An industrial bead is a heavier bead. You can go to two, three-inch beads in industrial tires, which you will never see in a tractor tire, because it has to hold this particular heavy piece of equipment together. It is also made with a flat-based rim. It has a two-piece rim where a tractor tire is made to go on a one-piece rim. All of these are differences between a tractor and industrial tire, even though the tires may be the same."

After having made the foregoing distinctions, Mr. Hill, in answer to a question as to the nature of the tires in the case at bar, responded that "[t]hey are definitely agricultural tires; that's all they could be used for." In cross-examination he amplified his prior response as to the differences between agricultural tires and industrial tires, as follows:

" * * * the industrial tire is built altogether different. The industrial tire is a much ruggeder tire. The rubber is heavier. There is more rubber surrounding the cord of the tire. The treading is shallow to give you traction over the road. The tread is probably an inch thick, but the bars are three inches wide, whereas the bars on a tractor tire are an inch wide. That means you are suspended up on the road as you are going along on a tractor on high cleats that are four inches high. There is nothing to give you traction on hard surfaces because you are up in the air. With the industrial tire you are sitting down on the ground where you belong over the road on hard surfaces. With a tractor tire you are not; you are sitting up in the air on four inch or five inch cleats that are spaced apart 8 to 10 inches."

In cross-examination he agreed with the testimony of Mr. Feinberg that the tires in controversy are agricultural tires.

Also in cross-examination, Mr. Hill was asked whether a tire, such as those in controversy, could be used on a hard surface or on the road. He replied that a farm tire could be used on a highway only for a short distance, such as going from a farm on one side of the road to one on the other side. Such a tire, the witness explained, is "[d]efinitely not" suitable for use on the road, nor could it be used on a hard surface "[b]ecause it's not designed for that purpose."

The witnesses for the defendant possessed none of the expertise of the witnesses for plaintiff, and one admitted readily having no experience with agricultural equipment. The most that can be said of their testimony is that they testified to having seen tires similar to those in issue on tractors that were not used for agricultural purposes.

Defendant's second witness testified that he had seen tires, similar to those claimed by plaintiff to be agricultural tires, on an industrial tractor on a Boston street and on some new industrial tractors on a flat car in a train yard. In cross-examination this witness' attention was directed to a specific tire illustrated in an exhibit entitled "Dunlop Farm Service Tires". He admitted that the tire that appeared in that brochure looked "very similar" to plaintiff's illustrative exhibit of a tire in issue. However, notwithstanding the title of the brochure, he still would not concede that it was a farm service tire. He did say, however, that "it had a dual purpose."

Defendant's final witness was an import specialist with the Bureau of Customs who, in 1967 and 1968, was involved in the classification of tires. He was shown the invoices in protest 68/57890 and protest 68/50762, and was asked whether there was anything there that would lead him to conclude that the tires on the invoices were agricultural tires. The witness stated that he noted nothing in the invoices that would lead him to conclude that these tires were for agricultural use, even though on cross-examination it was pointed out that the invoices contained such phrases as "Rib Tractor Imp Tyres", and "Front & Rear Farm Implement Tyres". It is significant to note that notwithstanding the comment of the trial judge as to this portion of the witness' testimony, that "notwithstanding the fact that it says farm, or whatever it says, that this wouldn't make any difference in his classification", no explanation was given nor was the matter pursued further.

An examination of the record, together with the exhibits in this case, will demonstrate with abundant clarity that the plaintiff has borne its dual burden of proof, and has successfully overcome the presumption of correctness that attaches to the classification of the district director.

Defendant, in an attempt to show that plaintiff has not satisfactorily established that the tires in issue were "designed for" tractors suitable

for agricultural use, or for agricultural or horticultural machinery or implements, has cited and quoted from the cases of *United States v. Faber*, 7 Ct. Cust. Appls. 406, T.D. 36980 (1917), and *American Astral Corporation v. United States*, 62 Cust. Ct. 563, C.D. 3827, 300 F. Supp. 658 (1969).

From the *Faber* case, defendant quotes the following paragraph, and then asks whether, in the case at bar, it may be said that the tires in issue *"were peculiarly and specially fitted* for tractors suitable for agricultural use, or agricultural and horticultural implements." (Defendant's brief, p. 12) [Emphasis in original]:

> "By the use of the word 'designed' it must be assumed that the Congress intended to include only such articles as were peculiarly and specially fitted for being carried on or about the person and devoted to such use." 7 Ct. Cust. Appls. at 407.

In the *Faber* case the question presented was whether certain lead pencils composed in the larger part of wood, but which constituted metal chief value, were dutiable under paragraph 356 of the Tariff Act of 1913 as "articles * * * designed to be worn on apparel or carried on or about or attached to the person * * *". The pencils were used primarily as artists' pencils.

The Board of General Appraisers concluded that there was nothing about the appearance of the pencils which indicated that they were designed to be carried on or about or attached to the person any more than there was about the ordinary pencil of wood. Hence, the board held that while they might occasionally have been used for marking packages and might have been carried in the pocket of the users, as the ordinary lead pencil, those facts alone did not justify their classification as claimed. The appellate court in affirming the decision stated that "something more is essential than the fact that an article is so constructed as to be susceptible of being carried on or about the person." This sentence, in the *Faber* case, is followed by the quotation in the defendant's brief to the effect that by the word "designed" Congress intended only such articles as were "peculiarly and specially fitted" for being carried on the person.

The *Faber* case was decided on the evidentiary basis that "the uses to which these pencils are devoted are such as do not call for their being carried on or about the person", and the "uses which are shown negative any claim that the pencils are carried about the person or in the pocket except temporarily while in actual and constant use."

Plaintiff, in the case at bar, would not take exception to any statement or principle set forth in the *Faber* case. Factually, the two cases are not at all analogous. Indeed, in the *Faber* case the court took judicial notice of the fact the pencils therein, "having different sizes of lead, and different colors, are used by draftsmen and architects, with frequent changes from one to the other, and that ordinarily

they would be laid upon the desk ready for frequent shifting from one to the other, or if placed in the pocket for convenience would not be designed to be carried on the person." 7 Ct. Cust. Appls. at 408. It would seem clear, therefore, that defendant can derive no support for its position from the *Faber* case. In the case at bar there is no doubt that the tires embraced within the protests, were "peculiarly and specially fitted" for the particular needs and requirements of agricultural or farm use. All of the testimony which distinguished farm or agricultural tires from industrial tires pertained to differences designed to meet particular uses. The record is replete with testimony which sets forth the distinguishing features of the tires which make them suitable either for one use or the other.

In the *American Astral Corporation* case the court held that, insofar as the tennis gloves therein were specially designed for use in the game of tennis, they were properly classifiable as lawn tennis equipment under item 734.88 of the Tariff Schedules of the United States. The defendant, in the case at bar, attaches great importance to the fact that, in the *American Astral Corporation* case, the court gave much weight to the testimony of plaintiff's witness therein who had actually designed the lawn tennis glove that was the subject of the litigation. The court therein stated:

> "The witness further testified (on cross-examination) that while the gloves in question could theoretically be used for a number of uses, they are not designed for, nor are they suitable for, use in other sports such as archery, bowling or handball." 62 Cust. Ct. at 566.

The defendant asserts that the *American Astral Corporation* case shows that "evidence of the design of an article for a specific purpose is best received from a witness who has actually *designed* or *manufactured* the article in question or an article of a similar nature, or one who at least has some detailed knowledge of the design or manufacture of such article." (Defendant's brief, p. 13) [Emphasis in original]

From whom such evidence "is best received" is not the pertinent question. In the case at bar, the question is whether there is in the record sufficient competent evidence that the tires in question were "designed for" tractors suitable for agricultural use, or for agricultural or horticultural machinery or implements. This fact has been satisfactorily established. Surely, the *American Astral Corporation* case did not intend to limit the testimony as to the purpose for which something was designed to the designer himself. Although the designer may best explain his "design", such testimony may be forthcoming from any qualified witness who has knowledge of the facts. See *Stonewall Trading Co.* v. *United States*, 64 Cust. Ct. 482, C.D. 4023, 313 F. Supp. 410 (1970).

The defendant, in its brief, has discussed the requirement that the tires be "designed for" a particular purpose, as though the words themselves were some magic incantation. It must not be overlooked that the words "designed for" were in fact used by plaintiff's witness. Quite apart, however, from the use of the specific words, there is no doubt of the particular purpose and special suitability of the tires in question. Even though plaintiff's witnesses were neither the designers nor manufacturers of the tires, they were surely eminently qualified to testify as experts as to all aspects of the tire business, including the sale and ultimate use of the tires. Mr. Hill, for example, has sold tires, including agricultural tires, for 19½ years. Mr. Hill not only testified that the controverted tires "are definitely agricultural tires", but he also added: "that's all they could be used for."

As for the knowledge of the witnesses for the plaintiff, on the question of use of the tires at bar, one may well quote the following statement from the case of *Klipstein* v. *United States*, 1 Ct. Cust. Appls. 122, 124, T.D. 31120 (1910):

> "Importers and merchants are naturally desirous of increasing the number of their customers and the demand for the goods in which they deal, and as they have every incentive for knowing the uses to which their wares are or may be put it is only fair to assume, at least *prima facie*, that the only uses known to them are the only uses of such wares."

Since the probative weight given to testimony of executives stems from their experiences in handling their products (*F. B. Vandegrift & Co., Inc.* v. *United States*, 56 Cust. Ct. 103, 112, C.D. 2617 (1966)), the testimony of plaintiff's witnesses in the case at bar, with respect to use of the controverted merchandise, is entitled to considerable weight. Furthermore, as stated by the Court of Customs Appeals in *United States* v. *F. W. Woolworth Co.*, 16 Ct. Cust. Appls. 421, 423, T.D. 43136 (1928), with respect to the use of rubber balls for physical exercise and in outdoor games:

> "Surely, if they are extensively used for such purposes, we should not infer that they were not designed to be so used."

In the case at bar, therefore, to say, as does the defendant in its brief, that "plaintiff has not even attempted to establish the purpose for which the tires in question were designed, through evidence of sale or ultimate use", is to ignore the testimony of plaintiff's witnesses, all of the exhibits, and the dictates of common sense.

It is important to note that the claimed item 772.50 provides for tires "designed for tractors" under item 692.30, *or* "for agricultural or horticultural machinery or implements" under item 666.00. Clearly, therefore, item 772.50 applies if the tires in question come under either

of the alternative provisions. With reference to item 692.30, it is particularly pertinent to note the *Tariff Classification Study*, 1960, Schedule 6, at pages 325–326, which states:

"Items 692.30 and 692.35 cover tractors (except platform tractors and automobile truck tractors). Item 692.30 would put on a sounder basis the existing treatment of tractors as agricultural implements under paragraph 1604 of the free list of the Tariff Act of 1930. In recent years, practically all imports of tractors have been admitted free under Paragraph 1604. Tractors are mobile power units used for many purposes, including agricultural, construction, road building, etc. Attempts to distinguish so-called agricultural-type tractors from types chiefly used for non-agricultural purposes necessarily involve unrealistic distinctions. For years it was the practice to classify as agricultural implements only so-called wheel-type tractors. Within recent months a so-called half-tread tractor, said to be of special design for agricultural purposes, was held to be free as an agricultural implement. Item 692.30 would change the present 'chief use' concept implicit in paragraph 1604 by providing for tractors 'suitable for agricultural use.' In view of the unrealistic distinctions which have been involved in the administration of the chief use concept, it is believed that the practical result has been more nearly a suitability test rather than one of chief use. Moreover, the suitability test is much less difficult to apply. Tractors not suitable for agricultural use are provided for in Item 692.35 * * *."

It is also helpful to add the following paragraph, from the case of *F. W. Myers & Company, Inc.* v. *United States*, 59 Cust. Ct. 445, 450, C.D. 3182 (1967), with reference to this portion of the *Tariff Classification Study:*

"It is clear that the foregoing note reflects a congressional intent in the enactment of item 692.30 of the Tariff Schedules not to exclude from the duty-free treatment accorded agricultural tractors under item 692.30 of the Tariff Schedules those imported track-type tractors capable of several uses, so long as their suitability for agricultural use is established. Also, tariff provisions for agricultural implements should be liberally construed so that the evident intent of Congress to benefit agriculture should be effected. *United States* v. *American Express Co.*, 12 Ct. Cust. Appls. 483, 486, T.D. 40693. The evidence adduced by the plaintiff establishes the suitability of the involved tractors to perform agricultural tasks, within the meaning of the aforementioned authorities and cases."

In providing for the classification of tires under item 772.50 of the tariff schedules, which are designed for tractors that are provided for under item 692.30, the test, as indicated by the *Tariff Classification Study*, is not whether the tires are for tractors that are chiefly used in agriculture, but rather whether they are designed for tractors *suitable* for such use. On this question, the testimonial record is overwhelming.

On the record in this case, it is the determination of the court that the controverted tires are properly classifiable under item 772.50 of the Tariff Schedules of the United States as "[t]ires, and tubes for tires, of rubber or plastics: [p]neumatic tires: [d]esigned for tractors provided for in item 692.30 or for agricultural or horticultural machinery or implements provided for in item 666.00", and the plaintiff's claim is sustained except as to those tires described as 750-14 on the invoices in protests 68/18001 and 68/50762, and except as to all of those tires listed or described on invoice number 4867/2 in protest 68/50762.

The court consequently holds that since the controverted merchandise of the three protests in this case, as previously limited herein, is properly classifiable under item 772.50 of the tariff schedules, it is entitled to free entry.

In view of the foregoing, the court holds that the presumption of correctness that attaches to the classification of the district director has been overcome, and that the protests, as previously limited herein, should be and are hereby sustained.

Judgment will issue accordingly.