David E. PORTER

v.

UNITED STATES.

C.D. 4641; Court No. 72–1–00129.

United States Customs Court.

March 17, 1976.

Stein & Shostak, Los Angeles, Cal. (S. Richard Shostak, Los Angeles, Cal., of counsel), for plaintiff.

Rex E. Lee, Asst. Atty. Gen., Washington, D. C. (Frank J. Desiderio and Joseph R. Borich, New York City, trial attys.), for defendant.

RE, Judge:

The question presented in this case pertains to the proper classification, for customs duty purposes, of certain motorcycle gloves imported by plaintiff from Sweden and West Germany. The gloves were classified by the customs officials as leather, seamed, unlined men's gloves, not seamed wholly or in part by hand, valued over $20 per dozen pairs, under item 705.50 of the Tariff Schedules of the United States (TSUS). They were therefore assessed with duty at the rate of 25 per centum ad valorem.

Plaintiff protests the classification, and claims that the motorcycle gloves were specially designed for use in the sport of motocross, and, therefore, are properly dutiable at only 9 per centum ad valorem under item 735.05 of the tariff schedules, as modified by T.D. 68–9, which provides for gloves "specially designed for use in sports." Plaintiff contends that since the gloves were "specially designed for use in sports," specifically the sport of motocross or motocross racing, they are excluded from classification under item 705.50 of the tariff schedules by virtue of schedule 7, part 1, subpart C, headnote 1(a).

Schedule 7, part 1, subpart C, item 705.50, TSUS, pursuant to which the merchandise was classified, provides as follows:

"Subpart C. Gloves

*Subpart C headnotes:*

1. For the purposes of this subpart—
(a) the term '*gloves*' includes all gloves and mittens designed for human wear, except boxing gloves, golf gloves, baseball gloves, and other gloves specially designed for use in sports; * * *

\* \* \* \* \* \* \*

Gloves of leather except gloves in item 705.35:

\* \* \* \* \* \* \*

 Seamed:
 Men's, not lined:

 \* \* \* \* \*

 Not seamed wholly or in part by hand:

 \* \* \* \* \*

705.50 Valued over $20 per dozen pairs ........25% ad val."

Plaintiff claims that the merchandise should have been classified under item 735.05, TSUS, as modified by T.D. 68–9, under schedule 7, part 5, subpart D, which provides:

"Subpart D. Games and Sporting Goods

*Subpart D headnotes:*

1. This subpart covers equipment designed for indoor or outdoor games, sports, gymnastics, or athletics, but does not cover—

 \* \* \* \* \* \*

 (v) other wearing apparel, other than specially designed protective articles such as, but not limited to, gloves, shoulder pads, leg guards, and chest protectors;

\* \* \* \* \* \*

735.05 Boxing gloves, and other gloves, not provided for in the foregoing provisions of this subpart, specially designed for use in sports .............. 9% ad val."

The record consists of the testimony of eight witnesses, four called by plaintiff, and four for defendant. It also contains fourteen exhibits, ten introduced by plaintiff and four by defendant. Since the case was tried with commendable competence, it reveals a clear picture of the nature of the imported merchandise, and the various aspects of the sport of motocross.

Defendant, in its post-trial brief, states that the question presented is "[w]hether the gloves at bar were spe-

cially designed for use in the sport of motocross racing." It takes the position "that while motocross racing is a sport * * * motorcycling in general is not a sport," and "that the so-called 'motocross' gloves were designed for the use of all motorcycle riders, are marketed as such to the general motorcycle public, and are used as such."

Plaintiff phrases the question presented in the statutory language of the tariff provisions, and states that the issue is: "Whether the gloves at bar, having features not found in ordinary gloves, are specially designed for use in sports, and are thereby excluded from classification under Item 705.50 in Schedule 7, Part 1, Subpart C, by headnote 1(a) thereof, and are classifiable in Schedule 7, Part 5, Subpart D, as other gloves, specially designed for use in sports, under Item 735.05, as claimed by plaintiff."

Plaintiff has introduced testimony to show that the gloves were specially designed for the sport of motocross, and were in fact so marketed and used. It contends that the special characteristics or features incorporated into the gloves show clearly that they were specially designed for the sport of motocross. Hence, they fully satisfy the statutory requirements for classification under item 735.05.

Defendant, on the other hand, asserts that the safety features of the gloves simply make them suitable for use in motorcycle transportation in general, and that the gloves are marketed "to the general motorcycle public."

That motocross racing is a sport has been stipulated. The evidence reveals that, although recently introduced from Europe, the sport has been widely accepted, and is generating a great deal of interest in the United States. Mr. Lars Larsson, plaintiff's first witness, and a professional motocross racer, testified that he emigrated to the United States from Sweden in 1967 to promote the sport of motocross. He became vice president of a company which imports motocross equipment into the United States.

Mr. Larsson described motocross as a sport wherein as many as 30 riders race competitively on a closed 1½- to 2-mile circuit dirt track over rough terrain for 30 to 40 minutes. His testimony fully described the sport, and the equipment and clothing that is either required or necessary in order to participate with relative safety and comfort. Additionally, his testimony indicates that the motocross gloves are used in related sports called "trial," "speedway" or "enduro" racing.

The cross-examination of Mr. Larsson was helpful and enlightening. It was shown that there are internationally accepted rules for motocross racing, and it was stipulated that the American Motorcycle Association Motocross Competition Rule Book specifically requires certain protective clothing and equipment. The parties agreed that the rules "specifically provide for helmets, goggles and boots," and that "clothing is defined with respect to its material but not with respect to any particular item." Mr. Larsson testified that before entering a race "they have a technical inspection of you and the motorcycle." He stated that for the "technical inspection * * * [y]ou have to show them that you have your helmet, goggles, gloves, pants and leather boots, and a jersey." In answer to specific questions by counsel for defendant, Mr. Larsson testified that the inspection includes the wearing of gloves, and that the gloves in issue are "one type" that would comply with the requirement for gloves.

The motocross racing track is a dirt road course. As described by Mr. Larsson, "[i]t goes over hills—down hills—over rocks—water crossing—off camber corners * * *." The testimony revealed that it is precisely this rough terrain which requires that the motocross rider wear special protective clothing. As the sport increases in popularity, there is a greater demand for motocross bikes, equipment, and accessories, such as plaintiff's motocross gloves. All of plaintiff's witnesses testified that the gloves in issue were specially designed to

meet that demand, and protect the hands of the motocross racer on the dirt track.

It is pertinent to note that the motocross or "dirt" motorcycle differs from the motorcycle suitable for lawful or safe "street" use in the following essential respects:

(a) it has a narrower frame;

(b) it has a greater ground clearance;

(c) it has "knobby" tires which cannot be used on paved roads;

(d) it lacks the necessary electrical lighting equipment; and

(e) it is lighter than the "street" motorcycle in that it weighs only 220 pounds instead of 400 to 500 pounds.

Mr. Larsson testified that he has advised designers of motocross gloves on the special features that motocross racers require in a glove that will protect their hands. Commenting on the elastic band around the wrist of the glove, Mr. Larsson stated that this feature was essential "to protect you from mud and water to get into your hand, and sand, because if you did get any of this in your hand, that would be just about the end of it because it would immediately tear your hands up."

Mr. Richard Miller, plaintiff's second witness, was editor of a motocross competition periodical entitled, "Motocross Action Magazine." Since the magazine was dedicated to motocross racing, and other dirt competition, it often contained motocross glove advertisements. Having raced in competition, and having sold motocross accessories, such as motocross gloves, Mr. Miller was qualified to speak on the special equipment that is either required or necessary in the pursuit of the sport of motocross.

Plaintiff's third witness, Mr. M. Edison Dye, imports, manufactures, and distributes motocross motorcycles and accessories. He has sponsored motocross races, and has also assisted in the design of motocross gloves. Mr. Dye testified that, in his opinion, the motocross gloves which he imports are used only in motocross racing. Plaintiff's final witness,

Mr. Robert Maynard, a motocross racer and motorcycle dealer, testified that the motocross glove "protects you from branches and sticks * * * [and] rocks flying off a competitor's motorcycle. It saves some pretty painful injuries."

Defendant's witnesses entered the field of motocross only recently. They are not expert motocross riders, and lack the expertise of plaintiff's witnesses. Mr. Robert Huff, manager of technical development for a company which manufactures and sells gloves and protective clothing, identified defendant's exhibit B as a motocross glove he helped to design. Mr. Huff testified that the glove, though marketed as a motocross glove, was not designed for use in sports but for motorcycle riding in general. Admittedly, this glove was a later copy inspired by plaintiff's gloves. This does not disprove the fact that plaintiff's motocross gloves were specially designed for motocross racing, and are marketed and used in the sport of motocross.

A witness for the defendant testified that he observed motorcyclists wearing motocross gloves for highway use. The testimony, however, indicates that, although motocross gloves may increase protection in ordinary motorcycle riding, the street or highway rider would find plaintiff's gloves uncomfortable. For example, Mr. Robert Maynard, an expert witness for plaintiff, testified that the motocross glove "offers absolutely no protection from the cold." Distinguishing between motocross gloves, and "street" gloves used by motorcyclists in general, Mr. Maynard stated that the motocross gloves lack both "padding in them to keep your hands warm," and a "gauntlet to keep the wind from going up your sleeves."

■ All of the witnesses for plaintiff were familiar with the design, importation, sale and use of the gloves in issue. Additionally, they were exceptionally well qualified to testify on all phases of the sport of motocross, and the equipment and accessories necessary for the sport. Their testimony was candid and

reliable, and clearly inspired confidence. As pioneers who introduced the sport into the United States, successful and winning riders, sponsors of motocross races, and writers for magazines having a world-wide circulation for motocross enthusiasts, their testimony "is of high probative value." *Davis Products, Inc., Frank M. Chichester v. United States*, 59 Cust.Ct. 226, C.D. 3127 (1967). It clearly establishes that the gloves in issue were specially designed for, and used by, motocross riders engaged in the sport of motocross.

On the crucial issue whether the gloves were specially designed for the sport of motocross, as claimed by plaintiff, or "the general motorcycle public," as is urged by the defendant, the court finds for the plaintiff. This finding is based upon an examination of the gloves themselves, the exhibits, and the unquestioned reliability of the testimony of all of plaintiff's witnesses.

■■■ In customs classification cases it is well established that whether an article is "specially designed" or "specially constructed" for a particular purpose may be determined by an examination of the article itself, its capabilities, and its actual use or uses. See cases cited in *Sports Industries, Inc. v. United States*, 65 Cust.Ct. 470, C.D. 4125 (1970). It is equally clear that a sample of the merchandise is a potent witness. *United States v. Halle Bros. Co.*, 20 CCPA 219, T.D. 45995 (1932); *United States v. Fred. Gretsch Mfg. Co., Inc.*, 28 CCPA 26, C.A.D. 120 (1940).

■■ On the present record the evidence is overwhelming that the gloves were specially designed, sold and used for the sport of motocross. The special features incorporated in the motocross gloves not only confirm that they were specially designed for motocross, but also distinguish them from other motorcycle gloves designed for "street riding." It cannot be disputed that the motocross gloves contain the following special features or characteristics:

(a) a shortened palm facilitating a smooth grip of the handle bars in order to avoid blisters;

(b) a reinforced thumb to protect against the rigid edge of the handlebar grips;

(c) an elastic band around the wrist to prevent, sand, gravel and the like, from entering the glove;

(d) protective strips or ribbing on the top or back of the fingers and knuckles which act as bumpers;

(e) an out-seam construction to prevent blisters.

The incorporation of these special features into the gloves clearly increases the cost of manufacture. The higher price to consumers would discourage those who could purchase a less expensive glove that would be suitable for motorcycle transportation. Purchasers, however, who ride on rough terrain, and need the added protection, pay a higher price for plaintiff's gloves because of their special features.

By means of "surveys," two of defendant's witnesses attempted to show that motocross gloves were used chiefly for recreational purposes or street riding, and not in competition. These "surveys" were conducted by telephone calls and visits to trade shows and distributors. Mr. J. Terry Cochran, director of marketing and national sales manager for a company which manufactures gloves and protective clothing, testified that his "[survey] findings were 30 per cent competition and 70 per cent non-competition." Mr. Robert Denman, a manufacturers' representative, testified that his "overall calculation was that 27 per cent of [motocross] gloves were used in competition and 73 per cent in non-competition or other use."

■■ Since the case of *United States v. 88 Cases, More or Less, Containing Bireley's Orange Beverage*, 187 F.2d 967 (3d Cir. 1951), federal courts have admitted the results of surveys despite their hearsay character. Objections which pertain to the unscientific and unreliable manner in which a survey is prepared and conducted affect only the weight, rather than the admissibility of the evidence. *General Motors Corp. v. Cadillac Marine & Boat Co.*, 226 F.Supp. 716, 734 (W.D.S.D.Mich.1964). A statement of the court

in the *General Motors* case, that there "are many signs that the survey was a great deal less than scientifically prepared," is equally applicable here. 226 F.Supp. at 738.

■ The results of defendant's surveys, conducted merely by asking distributors and riders their opinions whether motocross gloves were "used in competition," are not entitled to probative value for a variety of reasons. To mention some: (1) the responses were percentage estimates often obtained without consultation of sales records; (2) these estimates were furnished by individuals whose source of knowledge was never established; (3) no definition of terms such as "competition" was used in the surveys, and one can only guess what was in the mind of the person questioned; and (4) the data from which the results were derived is unavailable, and cannot be examined or verified.

The surveys were limited to a "competitive-noncompetitive" use comparison. Viewed in the most favorable light they inquired about the use of gloves in "competition," and not whether they were used in sports. Furthermore, since defendant's witnesses appear to have too restrictive a view of "sports," limiting them exclusively to competitive sports, the results of their surveys are unreliable if not misleading.

■ That a sport need not necessarily involve "competition" can be gleaned from recent cases decided by this court. In *Stonewall Trading Co. v. United States*, 313 F.Supp. 410, 64 Cust.Ct. 482 (1970), ski gloves, specially designed for the sport of skiing, were properly dutiable under the tariff provision which covered "ski equipment." Although skiing does not necessarily involve competition, at no time was it suggested it was not a sport. Relying upon the reasoning of *American Astral Corporation v. United States*, 300 F.Supp. 658, 62 Cust.Ct. 563 (1969), the court stated:

"In the words of Judge Maletz in the *American Astral Corporation* case, the statutory designation of 'equipment' is 'satisfied once it is shown that the ar-

ticle is specially designed for use in the game or sport.' On the question of special design, notwithstanding defendant's efforts to minimize the importance of the special features of the gloves, plaintiff's case is unassailable." 313 F.Supp. at 415, 64 Cust.Ct. at 489.

In *Sports Industries, Inc. v. United States*, 65 Cust.Ct. 470, C.D. 4125 (1970), underwater divers' gloves were held to be gloves specially designed for use in sports within item 735.05, the tariff item under which plaintiff claims classification for the motocross gloves. Much that is written in the *Sports Industries* decision is applicable to the case at bar. There, because of the evidence of the physical characteristics of the gloves, the court held that they were specially designed for the sport of underwater swimming, skin diving or scuba diving.

In the decided cases, the gloves were held to be sports gloves because their special features, characteristics and construction revealed that they were "gloves * * * specially designed for use in sports." The following quotation from the *Sports Industries* case is particularly pertinent:

" * * * the divers gloves in issue possess special features which clearly indicate that they were 'specially designed' for use in the sport of underwater swimming. If the tariff schedules were to contain a pertinent provision for underwater swimming equipment, it would seem clear that, under the applicable authorities, the gloves in issue would qualify as 'equipment'. There is, however, no specific provision which covers underwater swimming 'equipment'. Nevertheless, there would seem to be no question that underwater swimming, pursued solely for personal pleasure, and not commercially or for compensation, is a 'sport'. Under the circumstances, therefore, the gloves are classifiable under item 735.05 of the tariff schedules which covers 'gloves * * * specially designed for use in sports'." 65 Cust.Ct. at 474.

What is said of underwater swimming and divers' gloves in the *Sports Industries* case is equally applicable to the sport of motocross, which requires a special motorcycle, special equipment, and special accessories.

The solitary "dirt" rider on a motocross motorcycle who seeks the challenge of a rough terrain also engages in a sport as does the underwater swimmer and the skier. Equally important is the fact that such a rider requires the protection of motocross gloves quite as much as the rider who participates in an organized competition.

Also pertinent is the statement in the Summaries of Trade and Tariff Information, Schedule 7, Volume 4 (1968) at page 153 which includes "special bicycling gloves" as merchandise classifiable under item 735.05. In its brief, plaintiff comments that the inclusion of "special bicycling gloves" within item 735.05 "is particularly significant because if bicycling is deemed to be a sport for the purposes of Item 735.05, then certainly off-the-road cycling, with or without competition would also qualify."

In support of its position that "motocross gloves" were not specially designed for motocross, defendant, in its post-trial brief, stated that "[t]he term 'motocross gloves' is merely a 'generic term' in the trade, indicating that the manufacturer tried to sell them to motocross riders among other motorcyclists." Not only is there no support in the record for defendant's assertion, but it also attributes to plaintiff the poor sales policy of giving his product a limiting name which would restrict its market.

 In furtherance of its contention that the motocross gloves "were specially designed for use of all motorcyclists," a witness for defendant testified that he saw motocross gloves used by motorcyclists not engaged in sport. This, however, does not change the customs classi-fication status of "gloves * * * specially designed for use in sports." As stated in the *Stonewall Trading* case, "[t]he fact that the gloves may be used on [other] occasions * * * does not warrant a different result." 64 Cust.Ct. at 490. This point had been previously decided by the Court of Customs and Patent Appeals in the case of *Plus Computing Machines, Inc. v. United States,* 44 CCPA 160, C.A.D. 655 (1957) which teaches that the fact that an article is "specially constructed for a particular purpose means merely that it includes particular features which adapt it for that purpose." Significantly, the appellate court added that "[t]he purpose in question need not be the sole one served by the article and may not even be the principal one." 44 CCPA at 167.

The reasoning of the decided cases shows that since the court has determined that the motocross gloves were specially designed for use in the sport of motocross, they are classifiable as claimed even though they were not used exclusively for the sport of motocross.

In customs classification cases it is axiomatic that, in order to prevail, the contestant must bear a dual burden of proof. Plaintiff must prove that the customs classification of the merchandise is erroneous, and that the claimed classi-fication is correct. In the present case it is the determination of the court that plaintiff has succeeded in bearing his dual burden, and that the presumption that attaches to the correctness of the classification of the customs officials has been overcome.

Since the motocross gloves at bar were "specially designed for use in sports," they are excluded from classification under item 705.50 of the tariff schedules, and are properly classifiable under item 735.05.

The protests are sustained, and judgment will issue accordingly.